# Wytheville

## HEFLINGER v. HEFLINGER.

### June 14, 1923.

1. APPEAL AND ERROR—*Point Raised for First Time in the Appellate Court—Jurisdiction.*—Jurisdiction, as distinguished from venue, must always affirmatively appear, and objection to the jurisdiction of the trial court may be made in the Supreme Court of Appeals for the first time.

2. MAXIMS—*"Clean Hands"—In Pari Delicto—Annulment of Marriage—Suit by Guilty Party—Case at Bar.*—In the instant case complainant brought suit against defendant for annulment of their marriage on the ground that it was null and void under section 5113 of the Code of 1919, because the marriage was contracted within six months from the date of the decree for divorce from his first wife. It was urged that complainant could not maintain the suit in consequence of the equitable doctrine of "clean hands," and the maxim *in pari delicto.*

   *Held:* That if the jurisdiction to annul the marriage was a purely statutory remedy, plainly given by the statute without condition, there was no appeal to the conscience of the court, and it could not impose conditions. Hence the maxim of "clean hands" does not apply.

3. MAXIMS—*"Clean Hands"—In Pari Delicto—Annulment of Marriage—Suit by Guilty Party—Case at Bar.*—The right to bring a suit for annulment of marriage is expressly given by section 5100 of the Code of 1919, but this is probably merely declaratory of a pre-existing ground of equitable jurisdiction. Conceding, however, this jurisdiction, the equitable doctrine of "clean hands" is subservient to the public policy of the State, and cannot be invoked in contravention thereof.

4. MAXIMS—*"Clean Hands"—In Pari Delicto—Annulment of Marriage—Suit by Guilty Party—Case at Bar.*—If, as it is, section 5113 of the Code of 1919 is a declaration of public policy on the part of the State, and renders void a second marriage within six months from the date of the decree of divorce, the public interest is such that the remedy afforded by section 5100 of the Code of 1919 cannot be denied by the application of the doctrine of "clean hands."

5. DIVORCE—*Annulment of Marriage—Marriage within Six Months after Prior Decree of Divorce—Section 5113 of the Code of 1919.*—The annul-

10

ment of marriages in contravention of section 5113 of the Code of 1919 is a more effectual way of preventing such violations of the statutes and public policy of the State than an affirmance of them would be.

6. MARRIAGE—*Common Law Marriage—Validity in Virginia.*—Common law marriages are not valid in this State.

7. MAXIMS—*"Clean Hands"—In Pari Delicto—Annulment of Marriage—Suit by Guilty Party—Case at Bar.*—In the instant case complainant brought suit against defendant for annulment of their marriage on the ground that it was null and void under section 5113 of the Code of 1919, because the marriage was contracted within six months from the date of the decree for divorce from his first wife. It was urged that complainant could not maintain the suit in consequence of the equitable doctrine of "clean hands," and the maxim *in pari delicto.* All complainant asked was to have judicially declared the fact that the marriage was a void marriage, and in this the public was interested. No property rights were affected by a decree declaring the marriage void, but the true status of the parties was ascertained and judicially declared. Under such circumstances the doctrine of "clean hands" does not debar either party from bringing a suit to have a void marriage declared a nullity. It is not a suit for divorce. There was no valid bond of matrimony to be dissolved.

8. MARRIAGE—*Validity—Marriage Valid where Performed.*—Undoubtedly, the general rule is that a marriage valid where performed is valid everywhere, but there are exceptions to the rule as well established as the rule itself. These exceptions are generally embraced in two classes: 1st. Marriages deemed contrary to the laws of nature as generally recognized in Christian countries, and include only those which are void for polygamy or incest; 2nd. Marriages forbidden by statute because contrary to the public policy of the State.

9. DIVORCE—*Annulment of Marriage—Marriage within Six Months after Prior Decree for Divorce—Statutes—Construction of Section 5113 of the Code of 1919.*—Section 5113 of the Code of 1919 is a new statute, and as the language used in it is different from that of the statutes of other States on the subject, which had been construed by their appellate courts, it may be assumed that the revisors had some knowledge of those statutes and of the construction placed upon them, and intended to propose to the legislature, and that the legislature in enacting it intended to enact something different from the statutes of those States.

10. DIVORCE—*Annulment of Marriage—Marriage within Six Months of Prior Decree for Divorce—Statutes—Construction of Section 5113 of the Code of 1919.*—Section 5113 of the Code of 1919 declares that "neither party shall be permitted to marry again for six months from the date of such decree." This is a common provision of such statutes, and

it is generally held that it does not affect the validity of a second marriage outside of the State if such marriage was valid in the latter State. But section 5113 did not stop there, but went further and declared "and such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree  *  *  until the expiration of such six months." Therefore, the parties to the first marriage, though absolved from many of the obligations imposed by that marriage, are not absolved from the obligation to refrain from marrying another during the six months. As to this obligation, they continued to be husband and wife for six months from the date of the decree for divorce, and neither could lawfully intermarry with another.

11. DIVORCE—*Annulment of Marriage—Remarriage within Six Months of Prior Divorce—Section 5113 of the Code of 1919—Constitutionality and Extraterritorial Effect.*—The legislature has the power to enact section 5113 of the Code of 1919 forbidding remarriage within six months of a divorce, and to give it extraterritorial effect.

12. MARRIAGE—*Conflict of Laws—Going Outside of the State to Avoid the Law of Domicile.*—No State will permit its citizens to violate its marriage laws by going out of the State to avoid the law of domicile. But the law of domicile will govern in such case, and when they return, they will be subject to all its penalties as if said marriage had been celebrated within the State whose public law they have set at defiance.

13. MARRIAGE—*Going Outside of State to Avoid the Law of Domicile—Annulment of Marriage—Marriage within Six Months of Prior Divorce—Section 5113 of the Code of 1919.*—Section 5113 of the Code of 1919, forbidding remarriage within six months of a decree for divorce, applies to citizens of Virginia who leave the State and marry in contravention thereof, and immediately return and resume their residence in the State. The restriction is not put upon one party only, but upon both; nor is it limited to the place where the subsequent marriage took place. No matter where the subsequent marriage takes place, "the bond of matrimony (of the first marriage) shall not be deemed to be dissolved as to any marriage subsequent to such decree  *  *  until the expiration of such six months."

14. MARRIAGE—*Remarriage within Six Months of Prior Decree for Divorce—Sections 5087, 5089 and 5113 of the Code of 1919—Remarriage Absolutely Void.*—In the instant case complainant had been previously married and divorced. Within six months of this prior decree for divorce he married defendant in Maryland, both being at the time citizens and residents of Virginia and having no intention of changing their citizenship or residence. Shortly after the marriage they returned to Virginia and within a few months complainant brought this suit to annul his marriage to defendant.

    *Held:* That complainant was not an unmarried man when he married

the defendant, and neither in Maryland nor elsewhere could he take unto himself a second wife within six months of his prior decree of divorce. When he did so, he had a former wife living, and the second marriage was absolutely void. Code of 1919, sections 5078, 5089. Both parties, being residents of the State, had actual or imputed knowledge of the consequence of their act.

15. MARRIAGE—*Divorce—Power of the State—Remarriage within Six Months after Former Decree.*—The State is directly interested in determining the status of its own citizens, and to this end can and does establish and enforce its own policies in relation to marriage and divorce, and when it declares that a decree for divorce shall not be effective except after the lapse of a given time and upon designated conditions, it is fully within its rights and powers.

16. MARRIAGE—*Annulment of Marriage—Object of Section 5113 of the Code of 1919—Remarriage within Six Months after Decree of Divorce.*—It is a matter of common knowledge that one of the frequent causes of divorce is the desire of one of the parties to marry another, and as this could be done immediately upon a decree of divorce, there was a temptation to secure the divorce by collusion in fraud of the law. In order to remove this temptation, or avoid its effect, and to protect and preserve the existing marriage, section 5113 of the Code was enacted. The object of the section was not merely to impose a penalty on the offending party, but to declare an incapacity on each of the parties to enter into a marriage contract with another, at any place, within six months.

17. MARRIAGE—*Annulment of Marriage—Remarriage within Six Months of Prior Decree—Validity of Such Marriage in Another State.*—In the instant case where complainant and defendant, citizens and residents of Virginia, were married in Maryland within six months after complainant's divorce from another, the marriage was not valid according to the law of Maryland, because complainant had a wife living from whom he had not been divorced. The time when the divorce decree was to become operative had not yet arrived.

18. DIVORCE—*Decree—Provisions of Section 5113 of the Code of 1919—Part of Decree—Full Faith and Credit.*—Under section 5113 of the Code of 1919 a decree of divorce is not operative at all as to a subsequent marriage until the expiration of six months from the date of the decree. This is a legislative construction of the meaning of a decree for divorce in this State, and this construction is as much a part of the decree as if copied into the decree itself, and is entitled to full faith and credit in every other State of the Union under the provisions of article 4, section 1, of the Constitution of the United States.

19. DIVORCE—*Decree—Remarriage within Six Months—Section 5113 of the Code of 1919.*—Under section 5113 of the Code the decree for the divorce, until the expiration of six months, has no greater force than

a decree *nisi* and it is said that a marriage contracted after the entry of a decree *nisi* and before the final decree of divorce is illegal and void.

20. DIVORCE—*Annulment of Marriage—Remarriage within Six Months of Decree of Divorce which Contains no Provision as to Remarriage—Section 5113 of the Code of 1919—Full Faith and Credit.*—Under section 5113 of the Code of 1919 a decree of divorce, although it contains no provision as to remarriage, leaves the first marriage so far undissolved as to prohibit a second marriage within six months of the decree; and the decree being valid, and having this meaning and effect, must be given full faith and credit in all of the other States of the Union.    If a judgment is conclusive in the State where it is rendered, it is equally conclusive elsewhere.

Appeal from a decree of the Hustings Court, Part II, of the city of Richmond.    Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Smith & Gordon*, for the appellant.

*Cutchins & Cutchins*, for the appellee.

BURKS, J., delivered the opinion of the court.

By a decree of the Circuit Court of the city of Norfolk, made June 22, 1920, Charles Heflinger was granted an absolute divorce from his wife, Verna B. Heflinger, on the ground of desertion.    The decree made no order as to the right of either party to marry again, nor any reference to the statute on the subject.    Thereafter, the said Charles Heflinger, the appellee, and Clelia L. Ramsey, the appellant, both of whom were citizens and residents of Virginia and had no intention of changing their citizenship or residences, left Virginia, and on July 10, 1920, were married in the city of Baltimore, Md., and shortly thereafter returned to Virginia and took up their

residence in the city of Richmond.    The pertinent stat-
utes on the subject are contained in the sections of the
Code given in the margin.*

Section 5113 is a new section introduced in the stat-
ute law of the State by the revision 1919, and not only
forbids either party to a divorce suit to marry within
six months from the date of the decree for divorce, but
further declares that "such bond of matrimony shall
not be deemed to be dissolved as to any marriage sub-
sequent to such decree, or in any prosecution on account
thereof, until the expiration of such six months."    Of
this statute the appellee, Charles Heflinger, had both
actual and constructive notice and the appellant had at
least that notice which is imputed to every citizen of the
laws of a general character of the State in which he re-
sides.

A few months after the return of the parties to Rich-
mond to reside, irreconcilable differences arose between
them, and the appellee filed the bill in the case in judg-
ment against the appellant for an annulment of their
marriage, on the sole ground that it was null and void

---

*Section 5087.  What marriages are void without decree.—All marriages between a white
person and a colored person, and all marriages which are prohibited by law on account of either
of the parties having a former wife or husband then living, shall be absolutely void, without any
decree of divorce, or other legal process.

Section 5088.  What marriages are void from time declared or time of conviction.—All
marriages, which are prohibited by law on account of consanguinity or affinity between the parties
and all marriages solemnized when either of the parties was insane, or incapable from physical
causes of entering into the marriage estate, shall, if solemnized in this State, be void from the time
they shall be so declared by a decree of divorce or nullity, or from the time of the conviction of
the parties, under section forty-five hundred and forty.

Section 5089.  Marriage of persons leaving the State to evade the law.—If any persons, resi-
dent in this State, one of whom is a white person and the other a colored person, or one of whom
had a former husband or wife living, or who are in the degree of relationship or consanguinity or
affinity within which marriages are prohibited by the law of this State, shall, with the intention
of returning to reside in this State, go into another State or country and there intermarry, and re-
turn to and reside in this State, cohabiting as man and wife, such marriage shall be governed by
the same law, in all respects, as if it had been solemnized in this State.

Section 5100.  Suit to annul a marriage.—When a marriage is supposed to be void for any
of the causes mentioned either in section five thousand and eighty-seven, five thousand and eighty-
eight, five thousand and eighty-nine, or five thousand and ninety, either party may, except as is
provided in the next section, institute a suit for annulling the same; and upon due proof of the nullity
of the marriage, it shall be decreed to be void by a decree of divorce or nullity.

Section 5113.  Dissolution of bond of matrimony; neither party to marry for six months.—
On dissolution of the bond of matrimony for any cause arising subsequent to the date of the mar-
riage, neither party shall be permitted to marry again for six months from the date of such decree,
and such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent
to such decree, or in any prosecution on account thereof, until the expiration of such six months.

under the laws of this State.    Appellant demurred to
this bill, and also answered.    In her answer she admits
the marriage in Baltimore on July 10, 1920, and that
she and appellee had been residents of the State of Vir-
ginia for more than one year prior to the institution of
the suit, and that she is still a resident, but denies that
she had any knowledge of any impediment to their mar-
riage.    She further sets up in her answer that the ap-
pellee "brutally assaulted her and hit her in the face
with a book and drove her out of his room in the pres-
ence of one of the doctors of said sanatorium."    Upon
this point she prays that her answer be treated as a
cross-bill, and that she be granted a divorce from the
appellee.    The appellee demurred to the cross-bill.    At
the hearing upon these pleadings, the trial court over-
ruled the demurrer of the appellant to the bill of the
appellee, and sustained his demurrer to the cross-bill,
and entered a decree annulling the marriage, which is
the decree appealed from.

There are several preliminary questions to be dis-
posed of before coming to the case on its merits.

[1] It is insisted that the trial court was without juris-
diction to hear and decide the case, because its jurisdic-
tion in divorce cases is purely statutory and the case is
not within any of the statutes cited, and that section
5113 of the Code has no extra-territorial effect.    This
is not a suit for divorce, but for the annulment of a void
marriage.    We do not doubt the jurisdiction of the trial
court, but the discussion of the point involved will be
deferred in order to avoid repetition.    The appellee's
answer to the objection to the jurisdiction of the court
is that it was not made in the trial court.    This answer
is not sound.    Jurisdiction, as distinguished from venue,
must always affirmatively appear, and the objection to
the jurisdiction of the trial court may be made in this

court for the first time.    *Shelton* v. *Snyder*, 126 Va. 626, 102 S. E. 83.

[2, 4] It has been urged upon us that the appellee could not maintain the suit to annul the marriage in consequence of the equitable doctrine of "clean hands" and the maxim *in pari delicto.*    If the jurisdiction to annul the marriage is a purely statutory remedy, plainly given by the statute without condition, there is no appeal to the conscience of the court, and it cannot impose conditions.    Hence the maxim of "clean hands" does not apply.    1 Pom. Eq., sec. 398; *Smith* v. *Henkel*, 81 Va. 524; *McClanahan's Adm'r* v. *Norfolk & W. R. Co.*, 118 Va. 388, 87 S. E. 731.    The right to bring a suit for annulment is expressly given by section 5100 of the Code, but this is probably merely declaratory of a pre-existing ground of equitable jurisdiction.    *McClung* v. *Terry*, 21 N. J. Eq. 225; *Fuller* v. *Fuller*, 33 Kan. 582, 7 Pac. 241; 2 Bish. Mar. & Div. & Sep., sec. 801-ff.    Conceding, however, this jurisdiction, the equitable doctrine of "clean hands" is subservient to the public policy of the State, and cannot be invoked in contravention thereof.    If section 5113 of the Code is a declaration of public policy on the part of the State, and renders void a second marriage within six months from the date of the decree of divorce, the public interest is such that the remedy afforded by section 5100 of the Code cannot be denied by the application of the doctrine of "clean hands."    The doctrine of "clean hands" is closely akin to the maxim *in pari delicto*, and the two are sometimes discussed as though involving substantially the same principle.    The authorities on the application of the doctrine of "clean hands" are not in harmony.

In speaking of the maxim *in pari delicto*, Judge Green said in *Starke's Ex'r* v. *Littlepage*, 4 Rand. (25 Va.) 368: "But this rule applies only in cases where the refusal of

the courts to aid either party frustrates the object of the transaction and takes away the temptation to engage in contracts *contra bonos mores,* or violating the policy of the laws.    If it be necessary, in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done, though both parties are *in pari delicto.*    The party is not allowed to allege his own turpitude in such cases nor defend at law, or prevented from alleging it in equity, whenever the refusal to execute the contract at law or the refusal to relieve against it in equity would give effect to the original purpose, and encourage the parties engaged in such transactions."    This doctrine was reaffirmed in *Cardwell* v. *Kelly,* 95 Va. 570, 28 S. E. 953, 40 L. R. A. 240, where, in referring to an illegal contract, the court said: "In a case of the nature of that at bar the court will be governed, in some degree at least, by its particular circumstances.    It will consider whether the good of the public and the policy of the law will be subserved and the making of such contracts be discouraged by enforcing the contract in the case before it, or by refusing to do so, and will do the one or the other as will advance the interest of the public and the policy of the law."

[5]  We are satisfied that the annulment of such marmarriages is a more effectual way of preventing such violations of the statutes and public policy of the State than an affirmance of them would be.

Upon the question of the right of the guilty party to bring a suit for the annulment of a marriage which is void by reason of the fact that there is a living consort of a prior marriage, the authorities are in conflict.  Probably the weight of American authority denies the right, basing their holdings either upon the doctrine of "clean hands" or the maxim *in pari delicto* and ignoring the ex-

ception to the maxim above mentioned, the interest of the State in the controversy, and the fact that no property rights of the parties are involved. *Rooney* v. *Rooney,* 54 N. J. Eq. 231, 34 Atl. 682; *Marre* v. *Marre,* 184 Mo. App. 198, 168 S. W. 636; *Ewald* v. *Ewald,* 219 Mass. 111, 106 N. E. 567; *Tefft* v. *Tefft,* 35 Ind. 45; *Fuller* v. *Fuller,* 33 Kan. 582, 7 Pac. 241. But the English cases, so far as we have been able to ascertain, uniformly take a different view.

In *Miles* v. *Chilton,* 1 Rob. Ecc. 684, 163 Eng. Reprint 1178, Dr. Lushington distinctly held that the fraud of the guilty husband did not debar him from relief, and that he could maintain a suit for annulment. This case was followed by *Andrews* v. *Ross,* 14 L. Rep. Prob. Div. 17, where it was said by Butt, J., that, while relief would be refused to the offending party in all other courts, it appeared from the authorities "that the Ecclesiastical courts have applied a different rule, and that the principles prevailing in regard to contracts of marriage differ from those prevailing in all other contracts known to the law," and that he felt bound by these decisions.

In *Sottomayor* v. *DeBarros,* L. R. 3 Prob. Div. 5, it is said by Cotton, L. J.: "But it is a well recognized principle of law that the question of personal capacity to enter into any contract is to be decided by the law of domicile. It is, however, urged that this does not apply to the contract of marriage, and that a marriage valid according to the law of the country where it is solemnized is valid everywhere. This, in our opinion, is not a correct statement of the law. The law of a country where a marriage is solemnized must alone decide all questions relating to the validity of the ceremony by which the marriage is alleged to have been constituted; but as in other contracts, so in that of mar-

riage, personal capacity must depend on the law of domicile."

In *Rogers* v. *Halmshaw,* S. C. 33 L. J. (Mat.) 141, 11 L. T. 21, 164 Eng. Reprint 1373, the facts appear to be practically identical with the facts in the case in judgment. No opinion was delivered, but the right of the plaintiff to sue was maintained by a decree annulling the marriage.

In 1 Bish. Mar., Div. & Sep., section 722, it is said: "In most instances the law estops a party to allege in a court of justice his own wrong. Therefore, one cannot maintain a suit to have his marriage set aside on the ground that it was contracted through his own fraud, though in law it is in substance void. Yet this rule does not, it seems, apply to a polygamous marriage; even the party who has entrapped the innocent into it being permitted, as well as the other, to bring suit to have its nullity declared." The author cites the following American authorities to support the text. *Glass* v. *Glass,* 114 Mass. 563, 566; *Ponder* v. *Graham,* 4 Fla. 23; *Martin's Heirs* v. *Martin,* 22 Ala. 86, and *contra, Tefft* v. *Tefft,* 35 Ind. 44.

In *Szlauzis* v. *Szlauzis,* 255 Ill. 314, 319, 99 N. E. 640, 642 (L. R. A. 1916 C, 741, Ann. Cas. 1913 D, 454), it is said that "The rule *par delictum* will not be applied, however, to prevent relief in a suit to annul and set aside a void marriage. That is a matter in which the State is an interested party. Under the facts as found by the court, the marriage should be set aside as void, but the parties are entitled to no other or further relief."

In *Arado* v. *Arado,* 281 Ill. 123, 117 N. E. 816, 4 A. L. R. 28, decided in 1917, it was held that public policy forbade the application of the doctrine of "clean hands" to a plaintiff seeking the annulment of an incestuous marriage forbidden by law. See also *Snell* v. *Snell,* 191 Ill. App. 239.

In *Martin* v. *Martin*, 54 W. Va. 302, 46 S. E. 120, 1 Ann. Cas. 612, an aunt and nephew, citizens of West Virginia, went to Pennsylvania and were married and returned to West Virginia and lived together as husband and wife for eighteen years, and at the time of suit had a son ten years old. Such a marriage was declared by the statutes of West Virginia to be voidable and was forbidden under penalty. The trial court dismissed a bill filed by the husband to annul the marriage, declaring that "a court of equity ought not to entertain a litigant who vaunted his own iniquity, and made that the sole grounds of the decree asked from it." In the opinion reversing the decree on appeal it is said: "If the parties could continue the marriage relationship without violating the criminal laws of the State, then the court might be justified in refusing to entertain the plaintiff's bill. But when the law forbids the continuance of their marriage relation, notwithstanding its inception may have been a misdemeanor, it is the duty of both parties to make restitution by having the marriage annulled promptly. Their hands may be unclean, but it is the duty of a court of equity to permit them to clean them when it can do so, and not permit such uncleanness to continue as a stench in the nostrils of the prople. 19 Am. & Eng. Ency. L. (2d ed.) 1212; *Com.* v. *Lane*, 113 Mass. 548, 18 Am. Rep. 509; *State* v. *Brown*, 47 Ohio St. 102, 21 Am. St. Rep. 790; 16 Am. & Eng. Ency. L. (2d ed.) 134. While the rule is that equity will not entertain persons with unclean hands, yet there are just exceptions thereto, and the statutes of this State on marriage and divorce have mercifully provided that those who unwittingly enter into marriage that leads to the continual violation of law, notwithstanding their original sin, may have such relation annulled, so that they may go and sin no more. Such transgressors should get from

before the public gaze as quickly as possible." This was not a case of incest according to *jus gentium*, for to bring it within this class "there must be such a relation between the parties contracting as to make the marriage incestuous according to the general opinion of Christendom; and by that test the prohibited degrees include, besides persons in the direct line of consanguinity, brothers and sisters only, and no other collateral kindred." *Com'th* v. *Lane*, 113 Mass. 458, 18 Am. Rep. 509.

[6, 7] Common law marriages are not valid in this State (*Offield* v. *Davis*, 100 Va. 250, 40 S. E. 910), and proof of any such would be unavailing to affect the present litigation. The parties have plainly and confessedly violated the provisions of the statute law of the State, and, whatever may be the rule applicable to other contracts, public policy forbids that a complainant should be barred from bringing a suit to declare null a marriage contract which never had any valid existence. The State is interested to preserve the integrity of the marriage tie, and to enforce its laws against prohibited marriages, and general rules applicable to private contracts should not be permitted to thwart the public policy of the State established for the protection of society. If the marriage in controversy was void from its inception, the public is interested that it should be so declared, and this public interest should not be defeated because the declaration of the fact is made at the instance of a guilty party. The decree of annulment adds nothing to the facts of the case, but simply operates as an estoppel against setting up the validity of the marriage in any future controversy. It leaves the property rights of the parties just as they were before. If the marriage was in fact void, neither party acquired any rights in the property of the other. Their property rights stand as if

there had been no marriage.    The decree of annulment only ascertains that there had been no valid marriage between the parties, and obviates the necessity of ever thereafter being compelled to show its invalidity.    If the complainant were acquiring any rights by virtue of his suit, other than the determination of his status in society, a different rule might apply, but he is acquiring none.    McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117.    All he asks is to have judicially declared the fact that the marriage was a void marriage, and in this the public is interested.    No property rights are affected, but the true status of the parties in society is ascertained and judicially declared. Under such circumstances the doctrine of "clean hands" does not debar either party from bringing a suit to have the void marriage declared a nullity.    It is not a suit for divorce.    There was no valid bond of matrimony to be dissolved.

Upon the main question at issue, little help can be derived from the decisions of other States which have been cited and discussed at length in the argument of counsel.    The decisions are not in harmony.    They all recognize the importance of preserving and protecting the marriage state, but some courts deem it more important to protect the innocent party and the offspring of the second marriage than to prevent the evil by preserving intact the first marriage.    A large number of courts regard the prohibition of marriage as a mere penalty affecting only the offending party and not the status of the parties to the second marriage, especially where the prohibited marriage takes place in another State, but they do not always agree as to what language will constitute a penalty and what not, nor as to the difference in the effect of the language when used only in the decree for divorce, or in the statute of the State where the

divorce is granted.    Others also require that the second marriage should be expressly declared to be void.  There are also differences of opinion as to the extent of the extra-territorial effect of the law of the State imposing the prohibition.    There are also divergent views on other related questions.    A review of these cases, some of which are cited in the margin,* would not be of much assistance in solving our difficulties.    The question must be solved by a proper construction of our own statutes in the light of the policy of the State, as indicated by prior decisions, and especially by the proper interpretation of the language used in section 5113.

[8] Undoubtedly, the general rule is that a marriage valid where performed is valid everywhere, but there are exceptions to the rule as well established as the rule itself.    These exceptions are generally embraced in two classes: 1st. Marriages deemed contrary to the laws of nature as generally recognized in Christian countries, and include only those which are void for polygamy or incest; 2nd.  Marriages forbidden by statute because contrary to the public policy of the State. *Com'th v. Lane*, 113 Mass. 458, 18 Am. Rep. 509; *Pennegar v. State*, 87 Tenn. 244, 10 S. W. 305, 2 L. R. A. 703, 10 Am. St. Rep. 648, 650.    The marriage in the case in judgment was declared void by the trial court under the second class above, as contrary to the public policy of the State.

[9, 10] Section 5113 of the Code, as stated above, is a new statute, introduced into the statute laws of the

*Dimpfel v. Wilson, 107 Md. 329, 68 Atl. 561, 13 L. R. A. (N. S.) 1180, 15 Ann. Cas. 753; Ex parte Crane, 170 Mich. 651, 136 N. W. 587, 40 L. R. A. (N. S.) 765, Ann. Cas. 1914A, 1173; Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505; State v. Shattuck, 69 Vt. 403, 38 Atl. 81, 40 L. R. A. 428, 60 Am. St. Rep. 936, Willey v. Willey, 22 Wash. 115, 60 Pac. 145, 79 Am. St. Rep. 923; Dudley v. Dudley, 151 Iowa 142, 130 N. W. 785, 32 L. R. A. (N. S.) 1170; Commonwealth v. Lane, 113 Mass. 458, 18 Am. Rep. 509; Whippen v. Whippen, 171 Mass. 560, 51 N. E. 174; Griswold v. Griswold, 23 Colo. App. 365, 129 Pac. 560; Stevenson v. Gray, 17 B. Mon. (Ky.) 193; Hoagland v. Hoagland, 27 Wyo. 178, 193 Pac. 843; Hooper v. Hooper, 67 Or. 191, 135 Pac. 205, 525; Conn. v. Conn., 2 Kan. App. 419, 42 Pac. 1006; Wilhite v. Wilhite, 41 Kan. 158, 21 Pac. 173; Wilson v. Cook, 256 Ill. 460, 100 N. E. 222, 43 L. R. A. (N. S.) 365; Nehring v. Nehring, 164 Ill. App. 528; Lanham v. Lanham, 136 Wis. 360, 117 N. W. 787, 17 L. R. A. (N. S.) 804, 128 Am. St. Rep. 1085, and cases cited in argument of counsel; note, L. R. A. 1916 C, 749.

State for the first time in the Code of 1919. There must have been a reason for its introduction, and as the language used is different from that of the statutes of other States on the subject, which had been construed by their appellate courts, we may safely assume that the revisors had some knowledge of those statutes and of the construction placed upon them, and intended to propose to the legislature, and that the legislature in enacting it intended to enact, something different from the statutes of those States. That section declares that "neither party shall be permitted to marry again for six months from the date of such decree." That was a common provision of such statutes, and it was often, if not generally, held that it simply imposed a penalty on the offending party, and did not affect the validity of the second marriage outside of the State if the said marriage were valid in the latter State. But the statute did not stop here, it went further and declared, "and such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree * * until the expiration of such six months." As to any subsequent marriage, there was no divorce. The "bond of matrimony" created by the first marriage was not dissolved so as to permit another marriage. The parties to the first marriage were absolved from many of the obligations imposed by that marriage, but not from the obligation to refrain from marrying another during the six months. As to this obligation, they continued to be husband and wife for six months from the date of the decree for divorce, and neither could lawfully intermarry with another. Such is the meaning of the language used, and the marriage in controversy brought the parties thereto within the meaning of sections 5087 and 5089 of the Code hereinbefore quoted in the margin.

[11] That the legislature had the power to enact section 5113 and give it extra-territorial effect so as to sustain the present suit for annulment is fully sustained by *Kinney* v. *Commonwealth*, 30 Gratt. (71 Va.) 858, 32 Am. Rep. 690, and cases cited; *Greenhow* v. *James' Ex'r*, 80 Va. 636, 56 Am. Rep. 603; *Brook* v. *Brook*, 9 H. L. Cas. 193; *Wilson* v. *Cook*, 256 Ill. 460, 100 N. E. 222, 43 L. R. A. (N. S.) 365; *Lanham* v. *Lanham*, 136 Wis. 360, 117 N. W. 787, 17 L. R. A. (N. S.) 804, 128 Am. St. Rep. 1085; *Com'th* v. *Lane*, 113 Mass. 458, 18 Am. Rep. 509, and many other cases.

In *Kinney* v. *Commonwealth*, 30 Gratt. (71 Va.) 858, 32 Am. Rep. 690, it is said: "There can be no doubt as to the power of every country to make laws regulating the marriage of its own subjects; to declare who may marry, how they may marry, and what shall be the legal consequence of their marrying. The right to regulate the institution of marriage; to classify the parties and persons who may legally marry; to dissolve the relation by divorce; and to impose such restraints upon the relation as the laws of God and the laws of propriety, morality and social order demand has been exercised by all civilized governments in all ages of the world.

"It is insisted, however, by the learned counsel for the plaintiff in error in the ingenious and able argument which he addressed to this court, that conceding the power of every State and country to pass such laws, yet they never act *extra territorial*, but must be confined, with rare exceptions, to such marriages as are contracted and consummated within the State where they are prohibited. He invokes for his client in this case the rule laid down by jurists and text-writers, 'that a marriage valid where celebrated is good everywhere.'

"This is undoubtedly the general rule. But there are exceptions to this general rule, and while in its applica-

tion and the affirmance of certain exceptions thereto, there was for a long time much confusion in the authorities and conflict in the cases, I think it may now be affirmed that there are exceptions to this general rule as well established and as authoritatively settled as the rule itself."

. After examining authorities on the subject, the judge continues: "But while the forms of entering into a contract of marriage are to be regulated by the *lex loci contractus*, the law of the country in which it is celebrated, the essentials of the contract depend upon the *lex domicilii*, the law of the country in which the parties are domiciled at the time of the marriage and in which the matrimonial residence is contemplated. Although the forms of celebrating a foreign marriage may be different from those required by the law of the country of domicile, the marriage may be good everywhere. But if the contract of marriage is such in essentials as to be contrary to the law of the country of domicile and it is declared void by that law, it is to be regarded as void in the country of domicile, though not contrary to the law of the country in which it was celebrated."

[12] Again, in speaking of parties going outside of the State to avoid the law of domicile, it is said: "No State will permit its citizens to violate its laws by such evasions. But the law of the domicile will govern in such case, and when they return, they will be subject to all its penalties as if said marriage had been celebrated within the State whose public law they have set at defiance." The doctrine of this case is reaffirmed in *Greenhow* v. *James' Ex'r*, 80 Va. 636, 56 Am. Rep. 603.

[13, 14] Did the legislature intend that section 5113 should apply to citizens of Virginia who left the State and married in contravention thereof, and immediately returned and resumed their residence in the State? The

restriction is not put upon one party only, but upon both; nor is it limited to the place where the subsequent marriage takes place.   No matter where the subsequent marriage takes place, "the bond of matrimony (of the first marriage) shall not be deemed to be dissolved as to any marriage subsequent to such decree   *   *   until the expiration of such six months."   The appellee was not an unmarried man when he married the appellant, and neither in Maryland nor elsewhere could he take unto himself a second wife, within the six months. When he did so, he had a former wife living, and the second marriage was "absolutely void."   Code, secs. 5087, 5089.   Not only so, but both parties, being residents of the State, had actual or imputed knowledge of the consequence of their act.

[15] Formerly divorces were of rare occurrence in this State, the first case having been decided by this court in 1871 (*Bailey* v. *Bailey*, 21 Gratt. [62 Va.] 43), but in recent years they have become so common as to be a menace to society.   The legislature, in its wisdom, has seen fit to designate certain causes for which the bond of matrimony may be dissolved, and when such causes in fact exist it is the duty of the courts to give effect to the statutes, but it was never intended to make the road easy for the parties to seek another adventure.   Both the legislature and the courts have recognized the sacredness of marriage as the foundation of our civilization.   Lawful marriage is an honorable estate, not to be entered into "unadvisedly or lightly, but reverently, discreetly, advisedly, soberly and in the fear of God." So also it should not be dissolved "unadvisedly or lightly," but "advisedly and discreetly," and the object of the statute was to remove a temptation which is too frequently the moving cause for the divorce, and to force upon the parties a deliberate consideration of the

gravity of their conduct in seeking the dissolution of the contract they have so solemnly entered into. Furthermore, the State is directly interested in determining the status of its own citizens, and to this end can and does establish and enforce its own policy in relation to marriage and divorce, and when it declares that a decree for divorce shall not be effective except after the lapse of a given time and upon designated conditions, it is fully within its rights and powers.

[16] It is a matter of common knowledge that one of the frequent causes of divorce was the desire of one of the parties to marry another, and as this could be done immediately upon a decree for divorce, there was a temptation to secure the divorce by collusion in fraud of the law. In order to remove this temptation, or avoid its effect, and to protect and preserve the existing marriage, section 5113 of the Code was enacted. This was a distinct declaration of public policy on the part of the State, which it had the right to enforce upon the parties to this suit, notwithstanding the marriage in Maryland. *Lanham* v. *Lanham, supra.* "The remedy of having a marriage declared invalid is not given primarily for the benefit of either party of the alleged marriage, but for the purpose of determining the status of the parties, and of enforcing the policy of the Commonwealth with regard to marriage and divorce." *Whippen* v. *Whippen,* 171 Mass. 560, 51 N. E. 174. The object of the statute was not merely to impose a penalty on the offending party, but to declare an incapacity on each of the parties to enter into a marriage contract with another, at any place, within six months. It was to hold the first marriage intact and undissolved as to subsequent marriages for six months from the date of the decree.

[17-19] Furthermore, all of the cases on the subject

of the effect of local laws on foreign marriages require
that the foreign marriage shall be valid according to the
law of the place where celebrated.   In the case in judg-
ment the marriage in controversy was not valid ac-
cording to the law of Maryland because the appellee
had a wife living from whom he had not been divorced.
The time when the divorce decree was to become opera-
tive had not yet arrived, and until it did become opera-
tive there was no divorce that fully dissolved the bond
of the former marriage.   The case is not like that of a
decree for divorce which is subject to the right of ap-
peal.   In that case the decree of the trial court is final
and conclusive until reversed on appeal, while under the
statute (section 5113) the decree of divorce is not opera-
tive at all as to a subsequent marriage until the expiration
of six months from the date of the decree.   Such is the
plain language of the statute, which is a legislative con-
struction of the meaning and effect of a decree for di-
vorce in this State, and which it was fully within the
power of the legislature to make.   This construction
of the decree for divorce which the legislature had
authorized the courts to make is as much a part of the
decree as if copied into the decree itself, and is entitled
to full faith and credit in every other State of the Union
under the provisions of article IV, section 1, of the Con-
stitution of the United States.   If this question had
been raised in Maryland instead of Virginia, and the
parties had pleaded the Virginia statute, and the facts
with reference to the residence of the parties in con-
nection with the decree of divorce, it would have been
the duty of the Maryland court to have given effect to
the statute regardless of the policy which dictated it,
because the husband had a living wife from whom he
had not been divorced at the time of the second mar-
riage.   Under section 5113 of the Code the decree for

the divorce had no greater force than a decree *nisi* and it is said that a marriage contracted after the entry of a decree *nisi*, and before the final decree of divorce, is illegal and void. *Com'th* v. *Stevens*, 196 Mass. 280, 82 N. E. 33, 124 Am. St. Rep. 555. The decree of divorce was entitled to the same faith and credit in Maryland as in Virginia. No more and no less. If not effective as a complete divorce in Virginia until the expiration of six months, it was not so effective in Maryland, and the Maryland marriage was void as well under the law of Maryland as under the law of Virginia. Such would seem to be the proper application of the full faith and credit clause of the Federal Constitution.

[20] No question has been raised as to the jurisdiction of the trial court in the first divorce case over both the subject matter and the parties, nor has the validity of the decree of divorce been called in question. It is simply a question of the effect of that decree in view of the statute. That it leaves the first marriage so far undissolved as to prohibit a second marriage seems too plain to admit of argument. The statute means that, or it means nothing. It says so in explicit language, and does not limit the place of a second or subsequent marriage. The decree being valid, and having this meaning and effect here, must be given full faith and credit in all of the other States of the Union. *Cheever* v. *Wilson*, 9 Wall. 108, 123, 19 L. Ed. 604; Cooley's Const. Lim. (5th ed.) 23, and note. "If a judgment is conclusive in the State where it is rendered, it is equally conclusive everywhere," in all courts in the United States. 2 Story on Const., sec. 1313; *Christmas* v. *Russell*, 5 Wall. 290, 302, 18 L. Ed. 475. In 2 Tucker on the Constitution, 625, discussing Art. IV, sec. 1, of the Constitution, it is said: "'The debates referred to clearly show that the words 'the effect thereof' meant the effect of

the acts, records and proceedings, and not the effect of the proof, and the decisions of the courts to this effect have been uniform." Such were the rights and liabilities of the appellee when the appellee brought the present suit in this State, but whether or not the courts of Maryland would have excluded him under the doctrine of "clean hands" is a matter affecting the public policy of that State to be there determined, and is not in issue here as the suit was brought in this State.

Much is said in some of the cases about visiting the iniquities of the guilty party upon the innocent party and the offspring of the union, but in this case there was no innocent party and no offspring. Both were citizens of the State for at least a year before the marriage, and are still such citizens. Their absence from the State was purely temporary. The appellee had both actual and constructive knowledge of the statute, and the appellant was chargeable with knowledge of it as one of the general statutes of the State. As to the children of such a marriage, they are adequately protected by section 5270 of the Code, declaring "The issue of marriage deemed null in law, or dissolved by a court, shall nevertheless be legitimate." Under this statute it has been held that the issue of a woman by a second marriage, which took place during the lifetime of her first husband and before the first marriage was dissolved, are legitimate, and will inherit from their father. *Stones* v. *Keeling*, 5 Call (9 Va.) 143; *Heckert* v. *Hile's Adm'r*, 90 Va. 390, 18 S. E. 841.

The liability of the appellee to prosecution for bigamy (the second marriage having been contracted in Maryland), or for lewd and lascivious cohabitation, is not involved in this case. Chapter 204 of the Code, which embraces the sections in controversy, carries with own penalties, and, under that chapter the marria..

controversy is void, and there attaches to it all of the incidents and consequences of a void marriage.

The decree of the trial court annulling the marriage in controversy will be affirmed.

*Affirmed.*