ARTHUR W. COOK *v.* FLORENCE J. M. COOK.

(76 A2d 593)

October Term, 1950

Present: SHERBURNE, C. J., CLEARY, ADAMS and BLACKMER, JJ.

. Opinion Filed November 8th, 1950.

*Everett L. Hathorn* for the petitioner.

*Fucci & Fucci* for the petitionee.

ADAMS, J. This is a petition seeking to annul two marriages between the parties; one solemnized at Elizabeth City, North Carolina, February 5, 1943, and the other at Elkton, Maryland, December 18th, 1943. The only ground relied upon is that at the time of each of the marriages, the petitionee was the wife of one Alfred H. Mann. Hearing was had by the court and findings of fact were made. Judgment was rendered that the purported marriage of February 5th, 1943, was null and void and dismissing the petition as to the marriage of December 18th, 1943. The case is here on the petitioner's exception to that part of the judgment dismissing the petition as to the second marriage.

The question on that exception is whether the judgment is supported by the findings of fact. *Colby's Executor* v. *Poor et al,* 115 Vt 147, 154, 55 A2d 605.

The findings show the following material facts: The petitioner is a resident of Windsor in this state and has had a residence there since 1940; he has been in the United States Navy since 1938. A purported marriage was solemnized between the petitioner and petitionee at Elizabeth City, North Carolina, on February 5th, 1943; they lived together thereafter in Virginia for about two months. When the parties became acquainted in 1942 the petitioner knew the petitionee as Mrs. Albert Mann and at the time of the marriage knew that she had been married before but assumed she had been divorced. About two months after the marriage the petitioner discovered that the petitionee was the wife of one Alfred H. Mann at the time of the purported marriage; it was then suggested by the petitioner and agreed upon by the parties that the petitionee should go to Florida, remain there long enough to establish a residence for divorce purposes, secure a divorce from Mann and then return to the petitioner and they would remarry. Florida was chosen as it was the nearest and best place to obtain a divorce. The petitionee left Yorktown, Virginia, where the petitioner was stationed and where the parties had lived together since the marriage, went to Florida and remained a short time; she then left Florida and was at the Philadelphia Naval Hospital between April and August, 1943, after which she returned to Florida. When she consulted with Florida attorneys in the spring of 1943 she found it was necessary for a person to have an intention to remain permanently in Florida in order to gain a residence. Under the Florida law it is necessary for the complaining party to have an actual residence in

the state in order to secure a divorce and for the petitionee here to gain that residence she must have had an intention to live and remain in Florida. The petitionee wrote the petitioner from Florida what the law regarding divorce was. She never intended to reside in Florida; whatever time she spent there in 1943 was solely for divorce purposes and with no intention to establish a bona fide residence there and she intended to remain there only long enough to obtain her divorce and then return to and remarry the petitioner; that was understood and agreed upon by him. The petitionee here was granted a divorce from Mann by the Circuit Court of the 11th Judicial Circuit, Dade County, Florida, on September 10, 1943; she then left Florida and within two or three days met the petitioner at Newport News, Virginia; he was then stationed at Yorktown, Virginia, and thereafter the parties saw each other every day. On December 18th, 1943, they were again married at Elkton, Maryland. When her petition for divorce was heard in Florida the petitionee here, in order to fulfill the requirement of the Florida law, testified that she had lived in Florida much longer than she had and that she had intentions of remaining in Florida permanently and making that her home, when actually she had intentions of returning to the petitioner and remarrying him and she obtained her divorce by deceiving the Florida court as to the facts of her domicile. The petitioner here paid part of the expense of the trip to Florida and of the divorce action. Between December, 1943, and January, 1949, the parties lived together for periods totaling about one year. On March 29th, 1949, the petitionee instituted an action for separate maintenance against the petitioner in the Circuit Court for the First Judicial Circuit, Territory of Hawaii, both parties then being there; a decree was entered on April 7th, 1949, permitting the petitionee here to live separate and apart from the petitioner for a period of two years and ordering the petitioner to pay to the petitionee $200 a month for six months and $150 a month for the next eighteen months. On March 29th, 1950, the parties met in Norfolk, Virginia, and registered at a hotel as husband and wife under the name of Mr. and Mrs. A. W. King and slept together that night.

We are confronted directly with the question of the recognition of a divorce decree obtained in a sister state under the full faith and credit clause of the Federal Constitution when its validity is

attacked on the ground of no bona fide domicile in the divorce forum by either of the spouses.

The case now most often referred to as the leading authority on this subject is what is spoken of as the second Williams case, decided in 1945, *Williams* v. *North Carolina*, 325 US 226, 65 S Ct 1092, 1095, 89 L ed 1577, 157 ALR 1366. It was there held that the question of bona fide domicile was open to attack, notwithstanding the full faith and credit clause when the other spouse neither had appeared nor been served with process in the state. The findings here do not show either of these criteria. The finding and judgment of the North Carolina court, that a party who went to Nevada simply and solely for the purpose of obtaining a divorce intending to return to North Carolina on obtaining it, never lost the North Carolina domicile nor acquired a new one in Nevada, and that North Carolina was not obliged under the full faith and credit clause to recognize a divorce granted such a party, was affirmed. It was pointed out that the finding of the Nevada court that it had power to award a decree of divorce did not foreclose the reexamination by another state. In regard to jurisdiction in divorce matters the court said:

> "Under our system of law judicial power to grant a divorce—jurisdiction, strictly speaking,—is founded on domicile, * * * and since 1789 neither this Court nor any other in the English-speaking world has questioned it. * * * Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It touches basic interests of society. * * * If the finding by the court of one state that domicile in another state has been abandoned were conclusive upon the old domiciliary state, the policy of each state in matters of the most vital concern could be subverted by the policy of every other state." The court approved an instruction to the jury to which we subscribe that domicile is that place where a person "has voluntarily fixed his abode * * * not for a mere special or temporary purpose, but with a present intention of making it his home, either permanently or for an indefinite or unlimited length of time."

This Court in *Blondin* v. *Brooks et al*, 83 Vt 472, 483-7, 76 A 184, stated the law to be in accordance with that which has now been set forth in the Williams case. There is a long line of decisions from many jurisdictions of the same tenor, some of them decided before that case and many since. See Annotations in 39 ALR 677; 105 ALR 817; 143 ALR 1296; 157 ALR 1405; 163 ALR 370; 1 ALR 2nd 1385.

The petitionee in her brief says that probably the decision in *Blondin* v. *Brooks, supra,* would not now be upheld. In that regard she calls attention to *Deyette* v. *Deyette,* 92 Vt 305, 104 A 232. The opinion in the former case was by Chief Justice Rowell and in the latter by Chief Justice Watson. The latter was a member of the court when Blondin v. Brooks was decided and there were also two other justices who were members of the court when both cases were decided. Chief Justice Watson was meticulous in his opinions and all were keen students of the law. Moreover, Blondin v. Brooks was cited and mentioned in the opinion in Deyette v. Deyette and it was pointed out that the fraud in the former case was in regard to domicile which went to the jurisdiction of the court, which is the instant case, while the fraud in the Deyette case went to the cause for granting the annulment and not to the jurisdiction. The Deyette case is not in point here and does not change the law as decided in Blondin v. Brooks.

It therefore follows that, under the findings as to domicile and residence of the petitionee here in her divorce proceeding in Florida and the deception by her upon the Florida court involving its jurisdiction, this state is not bound to give recognition to that decree and it is invalid.

The petitionee claims, however, that the petitioner is estopped to assert such invalidity because of his own conduct in aiding the petitionee financially in procuring the Florida divorce, counselling and advising her in regard to going there for the purpose of obtaining a divorce and by later remarrying her and living with her as her purported husband; also because the parties slept together as husband and wife one night while this petition was pending. In short, she says that as the petitioner does not come into court with clean hands and is *in pari delicto* with her and has condoned the conduct, he is not entitled to the relief that he seeks.

It is not inappropriate to remark at the outset that the findings hardly show the hands of the petitionee clean and if it were a case

of relative cleanliness hers would compare rather unfavorably with those of the petitioner. The conduct of both parties since they became acquainted leaves much to be desired and cannot be approved.

██ ██ This is not a proceeding to annul a voidable marriage but one to obtain the judgment of a court declaring one void that is already a nullity. A person who has contracted a valid marriage is incapacitated to contract a subsequent marriage where such valid marriage has not been dissolved by death, divorce or otherwise; and a purported marriage contracted by a person so incapacitated is a nullity; and, subject to statutory provisions changing or qualifying the rule, a purported marriage contracted by one so incapacitated is a mere nullity and may be declared to be such in any proceeding, direct or collateral, where the question may arise and no judicial decree is necessary to establish its invalidity. 55 CJS, Marriage, § 17. See also 35 Am Jur, Marriage, § 148. A husband and wife are still married when a divorce between them is void and a marriage by either of them with another is void and of no effect. 35 Am Jur, Marriage, § 149.

██ ██ A marriage void in its inception does not require the sentence, decree or judgment of any court to restore the parties to their original rights or to make the marriage void, even where the statute makes provision for such annulment, but for the sake of the good order of society and for the peace of mind of all persons concerned, it is generally expedient that the nullity of the marriage should be ascertained and declared by the decree of a court of competent jurisdiction. Another reason why a judicial determination of such a marriage ought to be sanctioned is that opportunity should be given when the evidence is obtainable and the parties living, to have the proof of the invalidity of such marriage presented in the form of a judicial record so that it later cannot be disputed or denied. 35 Am Jur, Marriage, § 57. See also 55 CJS, Marriage, § 48. A decree of nullity by the court in connection with a marriage that is void will do no more than judicially declare what already exists in fact. *Smith* v. *Smith,* 72 Ohio App 203, 50 NE2d 889; *Heflinger* v. *Heflinger,* 136 Va 289, 118 SE 316, 32 ALR 1088.

██ In proceedings to annul a marriage the state is a silent, but not inactive third party, as such proceedings involve questions of public policy and the marriage relationship is of such public concern as to require the courts to scrutinize such actions to discover

their probable effect on the public as well as on the individual parties. 55 CJS, Marriage, § 48; *Rose* v. *Rose*, 274 Ky 208, 118 SW2d 529.

The general rule has been followed in cases where the public interest favors annulment of a void marriage, that the doctrine of clean hands does not prevent one from coming into court and obtaining the annulment of a marriage. Such rule has been followed with respect to incestuous marriages, bigamous marriages and marriages prohibited because within a certain time after the divorce of one of the parties. 35 Am Jur, Marriage, § 59.

Where the marriage sought to be annuled is void because of a prior subsisting marriage, defendant may not rely on the principle of clean hands or the rule of pari delicto and no phase of estoppel may be invoked to prevent annulment. 55 CJS, Marriage, § 51.

The rule that a party is estopped in a court of justice to allege his own wrong does not apply to a polygamous marriage. Bishop, Marriage & Divorce, Vol. I, § 722. There can be no estoppel when the marriage is absolutely void, and the rule of pari delicto will not be applied to prevent relief in a suit to annul and set aside a void marriage as that is a matter in which the state is an interested party. Schouler, Marriage, Divorce, Separation & Domestic Relations, § 1162.

In *Smith* v. *Smith, supra,* the court said:

> "Both parties knew the essential facts * * *. Neither changes his or her position on the representations of the other. * * * So there being no basis for estoppel, the defense of unclean hands is interposed, based upon the same facts. Stated in another way, it is said the parties are in pari delicto, and therefore, neither will be afforded relief. No matter how expressed, this principle has no application to an action to have a marriage declared null or for divorce on the ground that the marital ties—real or apparent—should be dissolved on the ground that either had a spouse living at the time of the marriage ceremony."

We also quote from the opinion in *Kiessenbeck* v. *Kiessenbeck,* 145 Or 82, 26 P2d 58:

> "Ordinarily where parties are in pari delicto a court of equity will not afford relief, but there are well

> recognized exceptions to this general rule. In the instant case, the interest of the state is paramount and, notwithstanding the laches involved and that the defendant was not the victim of any fraud, equity, even at this late date, will on the ground of public policy, terminate a social relationship that is polygamous in character."

We adopt and approve the foregoing statements and apply them to the instant case. A few of the many cases that support them are: *Jardine* v. *Jardine,* 291 Ill App 152, 9 NE2d 645; *Heusner* v. *Heusner,* 181 Misc 1015, 42 NYS2d 850; *Hunt* v. *Hunt,* 252 Ill App 490; *Frey* v. *Frey,* 61 App DC 232, 59 F2d 1046; *Rose* v. *Rose, supra; Stevens* v. *Stevens,* 273 NY 157, 7 NE2d 26; *Simmons* v. *Simmons,* 57 App DC 216, 19 F2d 690, 54 ALR 75; *Davis* v. *Davis,* 279 NY 657, 18 NE2d 301; *Davis* v. *Green,* 91 NJ Eq 17, 108 A 772; *Anonymous* v. *Anonymous,* 186 Misc 772, 62 NYS2d 130; *Johnson* v. *Johnson,* 245 Ala 145, 16 S2d 401; *Anderson* v. *Anderson,* 7 Cal 2d 265, 60 P2d 290. There are the following annotations dealing very fully with the subject: 54 ALR 80; 120 ALR 815; 122 ALR 1321; 140 ALR 914; 153 ALR 941; 175 ALR 538; 12 ALR2d 717.

The petitionee relies upon *Margulies* v. *Margulies,* 109 NJ Eq 391, 157 A 676, as sustaining her position. This case was not an annulment proceeding. In the New Jersey case of *Davis* v. *Green, supra,* which was an annulment proceeding the court said the doctrine of clean hands did not apply and granted the annulment. The New Jersey cases have received special comments from annotators. If Margulies v. Margulies is to be construed as sustaining the position of the petitionee it is contrary to what we believe to be the great weight of authority and the better reasoned cases.

She also calls our attention to *Kaufman* v. *Kaufman,* 177 App Div 162, 163 NYS 566. It is sufficient to say that this case was decided in 1917 and not by a court of last resort. The New York Court of Appeals decided the case of *Stevens* v. *Stevens, supra,* in 1937, which held contra to the Kaufman case. The case of *Heusner* v. *Heusner, supra,* was decided by a New York Appellate Division in 1943. That decision mentioned the Kaufman case and declined to follow it on the authority of the Stevens case. Since then there have been both Appellate Division and Court of Appeals cases

decided in accord with the Stevens case and citing it with approval.

She also calls our attention to *Lefferts* v. *Lefferts*, 263 NY 131, 188 NE 279. She must be mistaken in the case as she says it had to do with a Florida divorce. A reading of the case discloses that it involved a purported Nevada divorce and the court held that the second spouse could set up the void divorce procured in Nevada. It is hardly authority for the position of the petitionee, in fact it held to the contrary.

Moreover, our statute, V. S. 47, § 3191, referring to § 3190, provides that either party may file a libel to annul a marriage prohibited by law on account of either party having a wife or husband living. This court held in *Barney* v. *Cuness*, 68 Vt 51, 33 A 897, that this section applies to marriages solemnized without as well as within the state. Under the holdings of the cases in at least one state, Pennsylvania, mentioned in the foregoing annotations, where there is a similar statute, either party, whether innocent or culpable, may bring such a petition and be entitled to an annulment. The petitioner here under that statute would be entitled to bring his petition and receive the relief asked for.

█ There is no specific finding that Mann, the first spouse of the petitionee, was living at the time of the second purported marriage to the petitioner. It sufficiently appears that he was alive at the time of the first purported marriage. There is a presumption of life that continues throughout a seven year period and proof that one is alive on a certain day is, standing alone, enough to warrant an inference that he is alive on the following day. Such a presumption is not evidence but it takes the place of evidence until there is rebutting evidence confronting it. *Tyrrell* v. *Prudential Ins. Co.*, 109 Vt 6, 20, 21, 23, 24, 192 A 184. Here the petitionee went through one marriage ceremony with the petitioner, Cook, when it is found that she had a husband, Mann, then living; procured a purported divorce from Mann and then went through another marriage ceremony re-marrying Cook, all within a period of about ten months. Mann being alive at the time of the first marriage ceremony the presumption and inference is that he was alive at the time of the second.

█ The petitionee makes the statement in her brief that the findings show the parties slept together on March 29th, 1950. She says nothing more. This was while this petition was pending. This is inadequate briefing and merits no consideration. The peti-

tioner does not mention it in his brief. It was not mentioned by either party on oral argument.

The record is silent as to the grounds upon which the court dismissed the petition as to the second marriage. It may have been because of this finding and fact. We have no means of knowing. We must therefore consider whether this ground is sound. Also the marital status of the parties is the vital question here. Public policy, the interests of society and the state demand that their status be determined and settled on the merits of the matter. As was said in *Rose* v. *Rose, supra,*

> "In cases of this kind there is involved a high public policy and the withholding of apparent justice in an individual case is outweighed by the injury that may be done the public by giving judicial sanction to a bigamous marriage."

We, therefore, give this phase of the case consideration.

We reiterate that the conduct of the parties leaves much to be desired. We adopt what the court said in *Stevens* v. *Stevens, supra,*

> "Here the court was invoked to pronounce judgment directly upon the marital status, a relationship no stipulation or conduct of the parties can alter."

If this had been a petition for divorce from a lawful marriage or to annul a voidable marriage, condonation or conduct such as we have here after the petition was brought would necessarily result in the dismissal of the petition. Here we are dealing with a purported marriage that is void and a nullity. The conduct of the parties cannot condone or bring into existence that which never existed.

Condonation, the conditional forgiveness of a matrimonial offense, constituting a cause for divorce, is a defense only in the ordinary divorce action for some cause arising after marriage and the statutory provisions as to such defense have no part in a proceeding for annulment of marriage, although affirmance or ratification of a voidable marriage is such a defense. 35 Am Jur, Marriage, § 59. Condonation as known in divorce actions is not a

defense to annulment. Schouler, Marriage, Divorce, Separation & Domestic Relations, § 1161.

To the effect that living together after knowledge that the party is married to another is not a defense and does not prevent annulment, the following cases have come to our attention: *Kiessenbeck* v. *Kiessenbeck, supra; Lynch* v. *Lynch,* 34 RI 261, 263, 83 A 83; *Pain* v. *Pain,* 37 Mo App 110; *Seacord* v. *Seacord,* 3 Harr. 485, 33 Del 485, 139 A 80; *Hunt* v. *Hunt, supra; Rose* v. *Rose, supra; Johnson* v. *Johnson, supra; Davis* v. *Green, supra.* See also annotation 4 ALR 2d 542. This conduct of the parties did not warrant a dismissal of the petition as to the second purported marriage.

That part of the judgment excepted to dismissing the petition as to the purported marriage on December 18th, 1943, is not supported by the findings. It was error to dismiss the petition as to that marriage. The findings would have supported a judgment that such marriage was void and we will enter that judgment here.

*Judgment that the purported marriage between the parties of February 5th, 1943, is void is affirmed. Judgment that the petition is dismissed as to the purported marriage of December 18th, 1943, is reversed. It is adjudged that the purported marriage between the parties of December 18th, 1943, is null and void.*