**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 8 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

In the Matter of the Estate of
ELLIOTT D. BRUNER, DIANA J.
BRUNER, as Representative of the
Estate of Elliott D. Bruner,

Plaintiff-Appellant,

v.

ELLIOTT BIM BRUNER and LEDA
V. BRUNER,

Defendants-Appellees,

UNITED STATES OF AMERICA,

Movant-Appellee.

No. 02-5084

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 00-CV-386-H(J))**

---

Submitted on the briefs:

Steven M. Harris and Michael D. Davis, of Doyle Harris Davis & Haughey, Tulsa,
Oklahoma, for Plaintiff-Appellant.

Geoffrey M. Standing Bear, Pawhuska, Oklahoma, for Defendants-Appellees.

David E. O'Meilia, United States Attorney, and Cathryn McClanahan, Assistant
United States Attorney, Tulsa, Oklahoma, for Movant-Appellee.

Before **HENRY** , **BRISCOE** , and **HARTZ** , Circuit Judges.

**HARTZ** , Circuit Judge.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f). The case is therefore ordered submitted without oral argument.

Plaintiff Diana Bruner, as personal representative of the estate of her deceased husband E. Daniel Bruner (the Estate), brought this suit against Daniel's parents, Leda V. Bruner and E. Bim Bruner, seeking a declaration that the Estate is the equitable owner of certain tracts of land to which Leda and Bim hold legal title. Plaintiff claims that Leda and Bim used Daniel's assets to purchase the properties as part of a scheme to defraud both the state and federal governments into treating the properties as restricted Indian land (thereby avoiding certain taxes and obtaining other advantages), and orally agreed to convey legal title to Daniel at a later date. The district court entered summary judgment against Plaintiff on the grounds that her claims were barred by the clean-hands and estoppel doctrines, and were contrary to federal laws governing the sale and

encumbrance of restricted Indian lands. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

We view the evidence in the light most favorable to the party opposing summary judgment. *See Scarberry v. ExxonMobil Oil Corp.*, 328 F.3d 1255, 1257 (10th Cir. 2003). Daniel Bruner, a mixed-blood Creek Indian, wanted to acquire several properties that would be treated as restricted Indian land after acquisition. Restricted Indian land is "land or any interest therein, the title to which is held by an individual Indian, subject to Federal restrictions against alienation or encumbrance." 25 C.F.R. § 152.1(c). Such land is generally entitled to advantageous tax treatment. *See Okla. Tpk. Auth. v. Bruner,* 259 F.3d 1236, 1239 n.2 (10th Cir. 2001) ("'Income derived by individual Indians from restricted allotted land, held in trust by the United States, is subject to numerous exemptions from taxation based on statute or treaty.'" (quoting 1 Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates & Gifts ¶ 1.2.9 (3d ed. 1999)).

After discussing his plans with two attorneys, Daniel learned that if he purchased the properties in his own name, they would not be restricted. On the other hand, if his parents used their Individual Indian Money Accounts (IIMs) to purchase the properties, the land likely would be restricted. (An IIM is "an interest bearing account for trust funds held by the Secretary [of the Interior] that

belong to a person who has an interest in trust assets." 25 C.F.R. § 115.002.) Leda and Bim agreed to help Daniel obtain the desired result. Although Leda and Bim would formally own the parcels, they agreed that Daniel would have full use of the land, and they promised to either transfer legal title to him at his request or devise it to him in their wills. Several parcels were involved in this plan, but Plaintiff has conceded that "[t]he tracts involved in this litigation are Tracts 6 and 7." Aplt. Br. at 5.

### A. Acquisition of Tract 6

A straw man, Charles Hudson, using funds provided by Daniel, purchased Tract 6 for $47,000, holding the property without restrictions. A few months later, Mr. Hudson sold Tract 6 to Bim for $18,000. To make the purchase, Bim used IIM funds derived from an earlier condemnation of one of his restricted properties. Bim requested that restrictions be placed on Tract 6 because he was purchasing it as a replacement for the property that had been condemned. *See* 25 U.S.C. § 409a (authorizing restriction of land purchased with funds derived from condemnation of restricted land). Before Bim's request could be honored, the Secretary of the Interior had to approve the transaction. *See id.* Under authority delegated by the Secretary, the Superintendent of the Okmulgee Agency of the Department of the Interior's Bureau of Indian Affairs approved the restricted deed, which provided that the tract

-4-

shall be free from taxation, as provided by acts of Congress exempting from taxation restricted and allotted inherited lands of Indians of the Five Civilized Tribes, and shall not be leased, sold, or encumbered in any manner, except by and with the approval of the Secretary of the Interior or his authorized representative, as provided by the laws applicable to such lands.

Aplt. App. at 120. In other words, the tract was held as restricted Indian land.

After the purchase by Bim, Daniel began operating a smokeshop on Tract 6, enjoying the benefits occasioned by the land's restricted status. *Cf. State ex rel. Okla. Tax. Comm'n v. Bruner*, 815 P.2d 667, 670 (Okla. 1991) ("[T]he [Oklahoma Tax] Commission does not have a lawful right to impose or enforce its license and permit requirements upon . . . Indian cigarette retailers [licenced by the Muscogee (Creek) Nation Indian Tribe] doing business in Indian Country on behalf of the Tribe."). A short time later Daniel and Bim entered into a lease for Tract 6. The purpose of the lease was to replace the funds in Bim's IIM account that had been used to purchase the smokeshop property. Eventually, Bim was paid more than $18,000 under the Tract-6 lease.

### B. Acquisition of Tract 7

Leda agreed to purchase Tract 7 but initially had insufficient IIM funds to do so. Daniel could not simply add the necessary funds to Leda's IIM account, however, because only funds from certain sources are eligible for deposit in an IIM. *See* 25 C.F.R. § 115.702-115.703. Among the eligible funds are proceeds

from leases of trust property. *See id.* § 115.702. In preparation for the purchase, two of Daniel's companies leased Leda's trust property to increase the balance in her IIM. DJB Enterprises, Inc., leased one acre of Leda's restricted land for $1,000 per month, producing approximately $21,000 over the life of the lease; and Native American Trading Co., Inc., leased approximately one unimproved acre of Leda's restricted land, immediately tendering payment of $159,000 for the full lease term. The proceeds of both leases were deposited in Leda's IIM account and were later used, at least in part, to purchase Tract 7.

Because the seller of Tract 7 held it as inherited restricted Indian land, its conveyance had to be approved by the Oklahoma state court. *See* Act of August 4, 1947, Pub. L. No. 336, § 1, 61 Stat. 731, 731 (the 1947 Act). The Tulsa County district court approved the sale and the deed, which provided that

> no lease, deed, mortgage, power of attorney, contract to
> sell, or other instrument affecting the land herein
> described or the title thereto shall be of any force and
> effect, unless approved by the Secretary of the Interior
> or the restrictions from said land are otherwise removed
> by operation of law.

Aplt. App. at 158.

### C. Course of Proceedings

Initially, Plaintiff brought her Tract-6 and Tract-7 claims in connection with a condemnation action involving other properties owned by Leda and Bim. *See Okla. Tpk. Auth*, 259 F.3d at 1239. In that case the district court dismissed

-6-

the Tract-6 and Tract-7 claims for lack of jurisdiction. *Id.* at 1240. Following the dismissal, Plaintiff filed this quiet-title action in state court, seeking determination of the issues left unresolved in the earlier proceeding. *Id.* Under the authority of the Act of April 12, 1926, Pub. L. No. 98, § 3, 44 Stat. 239, 240 (the 1926 Act), the United States joined and removed the case to the United States District Court for the Northern District of Oklahoma. That court entered summary judgment against Plaintiff, ruling that her claims were barred by the doctrines of unclean hands and estoppel, and that recognition of her claims would be contrary to federal laws regulating the conveyance of restricted Indian lands. (In the meantime, in the condemnation case the district court had reversed its prior jurisdictional dismissal of the claims regarding Tracts 6 and 7. *Okla. Tpk. Auth*, 259 F.3d at 1240.) Plaintiff appeals, challenging the district court's entry of summary judgment on both jurisdictional and substantive grounds.

## II.  Discussion

### A. Jurisdiction

Plaintiff asserts that the district court lacked jurisdiction over the Tract-7 dispute. "Whether the district court had jurisdiction is a legal question that we review de novo." *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1121 (10th Cir. 2003). Under § 1 of the 1947 Act, the Oklahoma state court had exclusive jurisdiction to approve the conveyance of Tract 7. Plaintiff argues that by implication the state

court also had exclusive jurisdiction to determine whether its earlier approval of Leda's restricted deed should be set aside.

But a second act of Congress governs here. The 1926 Act states:

> *Any one or more of the parties to a suit in . . . the State courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma*, or the restricted heirs or grantees of such Indian *are parties*, as plaintiff, defendant, or intervenor, and *claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes*, . . . may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and *the United States may appear in said cause . . .* [and] within twenty days after the service of such notice on the Superintendent for the Five Civilized Tribes or within such extended time as the trial court in its discretion may permit the United States may be, *and hereby is, given the right to remove any such suit pending in a State court to the United States district court* by filing in such suit in the State court a petition for the removal of such suit into the said United States district court . . . . It shall then be the duty of the State court to accept such petition and proceed no further in said suit . . . . [*The federal district*] *court is hereby given jurisdiction to hear and determine said suit*, and its judgment may be reviewed by certiorari, appeal, or writ of error in like manner as if the suit had been originally brought in said district court.

1926 Act, § 3, 44 Stat. 239, 240-41 (emphasis added). In this suit Plaintiff seeks to quiet title in favor of the Estate and against Leda, the record owner of Tract 7. Leda "claim[s] title to" restricted Indian lands. Accordingly, the 1926 Act entitled the United States to join the suit and remove it to federal district court.

Once the case was properly removed, the district court had "jurisdiction to hear and determine [Plaintiff's] suit . . . as if the suit had been originally brought in [that] court." *Id.*

## B. <u>Summary Judgment</u>

We review de novo the district court's grant of summary judgment. *Scarberry*, 328 F.3d at 1256. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The district court granted summary judgment for Leda and Bim on three grounds. Because we affirm under the clean-hands doctrine, however, we need not address Plaintiff's challenges to affirmance on the other two grounds. Plaintiff argues that the clean-hands doctrine does not preclude her claims because (1) Bim and Leda, as participants in the fraud, are not entitled to invoke the doctrine against the Estate; (2) Daniel's wrongful conduct should not be attributed to his innocent heirs; and (3) under Oklahoma law, "a husband cannot make a disposition of property acquired during coverture in such a fashion as to defeat the wife's interest in such property and to leave his estate so depleted that

he cannot support his wife as required by statute or where the transfer is a fraud on his wife's marital estate." Aplt. Br. at 23. We disagree.

Plaintiff seeks to establish that the Estate, as Daniel's successor, has an equitable interest in Tracts 6 and 7. She contends that Daniel was able to acquire an equitable interest in each tract despite the restriction on the title, because either (1) the restriction, having been obtained by fraud, is invalid or (2) Daniel's interest was acquired before the restriction was placed on the tract. In either event, Plaintiff's claim depends on Daniel's having acquired an equitable interest in *unrestricted* property, so we must follow Oklahoma law governing the acquisition of equitable title. *See Sperry Oil & Gas Co. v. Chisholm*, 264 U.S. 488, 498 (1924) (After restrictions were removed under an act governing Five Civilized Tribes land, the land "bec[a]me in all respects subject to [the owner's] control, under the laws of [Oklahoma], just as the property of other citizens. All questions pertaining to [the land's] disposal fell under the scope and operation of [Oklahoma] law[]." (internal citation omitted)); Felix S. Cohen, Handbook of Federal Indian Law 619 (Rennard Strickland et al. eds., 1982) ("When . . . the federal restriction against alienation is removed from a 'restricted fee' allotment, the allottee owns the land in fee simple absolute and can alienate it in any way allowed by local law."). Because we determine, as set forth in the following discussion, that Daniel acquired no equitable interest under Oklahoma law, we

need not examine Plaintiff's contentions regarding whether such an interest could be recognized with respect to land that has a restricted title.

Oklahoma law declares that "to receive equity, [a person] must do equity." *Krumme v. Moody*, 910 P.2d 993, 996 (Okla. 1995). "Equity provides no relief when its aid becomes necessary through the party's own fault." *McDonald v. Humphries*, 810 P.2d 1262, 1269 (Okla. 1990). In particular, Oklahoma recognizes the clean-hands doctrine:

> Under the maxim, [h]e who comes into equity must come with clean hands, a court of equity will not lend its aid in any manner to one who has been guilty of unlawful or inequitable conduct in a transaction from which he seeks relief, nor to one who has been a participant in a transaction the purpose of which was to defraud a third person, to defraud creditors, or to defraud the government . . . .

*Camp v. Camp*, 163 P.2d 970, 972 (Okla. 1945) (internal quotation marks omitted). A related doctrine states, "Equity will not relieve one party against another when both are in pari delicto." *Id.* at 972 (internal quotation marks omitted); *see* Black's Law Dictionary 794 (7th ed. 1999) (defining "*in pari delicto* doctrine*"* as "[t]he principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing"). *See generally* 3 Dan B. Dobbs, Law of Remedies § 13.6 at 574-75 (2d ed. 1993) (noting relationship between unclean-hands and *pari delicto* doctrines)).

Here, Plaintiff attempts to establish the Estate's equitable interest by alleging a fraudulent arrangement for acquiring the two tracts. Plaintiff is not entitled to rely on that inequitable action, however, because Daniel, her predecessor in interest, was a party to the fraud. In other words, the desired relief is unavailable to Plaintiff because of Daniel's unclean hands.

Plaintiff argues that she is nevertheless entitled to recover because (1) the participation of Leda and Bim in the scheme precludes their use of the clean-hands doctrine or (2) Daniel's inequitable conduct should not bar the claims of those, like herself, who are simply innocent heirs. We discuss each argument in turn.

To support her first argument, Plaintiff cites *McDonald*, 810 P.2d at 1269, for the proposition that "a party who participates in a fraud may not invoke the equitable doctrine of unclean hands against another who participated in the fraud." Aplt. Br. at 22. This would be a remarkable proposition, because it would eviscerate the *pari delicto* doctrine. A wrongdoing plaintiff whose claim would otherwise be barred because he was *in pari delicto* with the defendant would nevertheless be able to recover; the defendant's wrongdoing would prevent him from claiming that the plaintiff had unclean hands (i.e., was *in pari delicto*).

In any event, we do not read *McDonald* to support Plaintiff's proposition. *McDonald* does nothing more than apply the precept that a party may not obtain

-12-

equitable relief by proving inequitable conduct in which he participated. In *McDonald* a vendor of oil and gas leases sued his broker for fraudulently concealing the terms of a sale and retaining a secret profit. To recover on his cause of action, the vendor relied on evidence of the broker's misconduct— misconduct which the vendor did not join in any way. The broker argued, however, that the vendor should be denied relief because the vendor had himself acted inequitably: he had made misrepresentations to prospective purchasers. *McDonald*, 810 P.2d at 1265, 1268. The argument failed, however, because the broker was a party to the deception of the prospective purchasers. *Id.* at 1269. In essence, the broker was not permitted to establish his position by offering evidence of inequitable conduct in which he had participated. *Id.* Refusing to consider evidence of the joint misconduct of the vendor and broker, the court ruled for the vendor.

In this case it is Plaintiff, not Leda and Bim, whose position resembles that of the broker in *McDonald*. To prevail on her claim that Daniel had an equitable interest in the tracts, she must prove inequitable conduct (deceiving the government) in which Daniel participated. In contrast, the claims of Leda and Bim do not depend upon proving any inequitable conduct, by anyone; they can simply rely on the face of the deeds at issue.

*Camp*, a decision approved by *McDonald*, 810 P.2d at 1268, supports our conclusion. In *Camp* the plaintiff conveyed land to his brother on the pretense of satisfying a valid debt. 163 P.2d at 971. The purpose of the conveyance was to deprive the plaintiff's wife (from whom he was obtaining a divorce) of her interest in the transferred property. *Id.* at 972. The plaintiff alleged that his brother had orally agreed that he would reconvey the land at a later date. *Id.* When the land was not reconveyed, the plaintiff sought enforcement of the oral promise. *Id.* The court found the plaintiff's claims barred by the clean-hands doctrine even though application of the doctrine would benefit the brother, also a participant in the scheme. The court explained:

> [T]hough it be conceded that [the brother] was a moving factor in a scheme to deprive plaintiff's former wife from obtaining a just judgment by a division in value of the partnership property jointly acquired, if plaintiff served his interest in those proceedings by his wrong, the parties are held in pari delicto and [e]quity will not relieve one party against another when both are in pari delicto; where both are equally in the wrong, defendant holds the stronger ground.

*Id.* (internal quotation marks omitted). Similarly, the clean-hands doctrine bars Plaintiff's claims notwithstanding the fact that those who stand to benefit from the doctrine's use, Leda and Bim, also participated in the alleged fraud.

As for Plaintiff's contention that she is an innocent heir who should not be held responsible for Daniel's inequitable conduct, she asserts claims solely as the representative of the Estate. She is claiming through Daniel, and the clean-hands

-14-

doctrine "applie[s] not only to the participants in the transaction, but to their heirs, and to all parties claiming under or through either of them." *Rust v. Gillespie*, 216 P. 480, 484 (Okla. 1923); *accord Wickham v. Simpler*, 180 P.2d 171, 175 (Okla. 1946). Although there is an exception to this rule for heirs who did not participate in the fraudulent conduct and can prove their claims without establishing the underlying fraud, *see Becker v. State*, 312 P.2d 935, 942 (Okla. 1957), that exception does not apply. Here, proof of the fraudulent scheme is essential to Plaintiff's claims. Thus, her claims are barred by the clean-hands doctrine.

Finally, we address Plaintiff's argument that if the transactions are approved, Daniel will have wrongfully depleted or committed a fraud upon the marital estate. The sole authority she cites for this proposition is *Sanditen v. Sanditen*, 496 P.2d 365 (Okla. 1972). The opinion in that case, however, states that "the principle [sic] criteria [sic] [for determining whether a transfer by the husband can be set aside] is the fraudulent intent of the husband to deprive the wife of her marital rights as provided by statute." *Id.* at 368. Here, although Plaintiff alleges fraud, she fails to suggest in any way that the purpose of the alleged scheme with respect to Tracts 6 or 7 was to deprive her of anything. On the contrary, Daniel's alleged intent was to enrich himself (which could only help her) by obtaining the advantages of having the tracts be restricted land. We reject Plaintiff's argument.

-15-

We AFFIRM the district court's entry of summary judgment.