2013 VT 1

# Victor J. Shattuck v. Donna Mae Peck

[70 A.3d 922]

No. 11-145

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed January 11, 2013

124

*Patricia G. Benelli* and *Amanda T. Rundle* of *Dakin & Benelli, P.C.*, Chester, for Plaintiff-Appellee.

*Melvin Fink*, Ludlow, and *Michael Rose* (On the Brief), St. Albans, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant Donna Mae Peck appeals from a superior court judgment granting plaintiff Victor J. Shattuck a writ of possession for the parties' former residence in Cavendish and denying defendant's counterclaim for an equitable interest in the Cavendish property and another former residence in Springfield. We affirm.

¶ 2. The facts as found by the trial court may be summarized as follows. The parties lived together for several years in defendant's mobile home located in Springfield, Vermont on a three-acre plot that defendant had purchased from her mother in 1988. The mobile home was purchased by defendant in 1994 with a $37,000 loan secured by the property. In 1999, some time after she was laid off from her job, defendant began to receive Social Security disability benefits of approximately $700 per month. Plaintiff

worked during this time at a variety of jobs, although his primary employment was as a subcontractor installing cable services.

¶ 3. Between December 1997 and June 1999, plaintiff purchased two adjoining parcels of land in Cavendish for $8500 each. Plaintiff made most of the payments for the first parcel, but defendant made a significant financial contribution toward payment of the second parcel. In 2001, plaintiff conveyed the Cavendish properties to himself and defendant as joint tenants with rights of survivorship, and defendant conveyed the Springfield property to herself and plaintiff as joint tenants with rights of survivorship. The court found that the conveyances were made for estate planning purposes, and were "entirely donative in nature."

¶ 4. In 2004, plaintiff invested approximately $50,000 and significant "sweat equity" in the construction of a home on the Cavendish property. Defendant contributed by cooking meals for construction crews, picking out decorative items, and doing some painting and finishing work. In July 2005, plaintiff signed a promissory note for a $90,000 loan to continue work on the house, and both plaintiff and defendant signed a mortgage as co-owners. The following month, the parties moved into the home's finished walk-out basement and rented the Springfield property to tenants. In August 2006, plaintiff obtained an additional $50,000 loan to complete construction of the residence. A month later, plaintiff took out a sizable loan that allowed him to pay off the previous two loans and provided him with an additional $30,000 in proceeds. He was the sole signer of the note and mortgage. The parties moved into the upstairs of the completed Cavendish house sometime in 2006.

¶ 5. On September 15, 2006, the same day that plaintiff signed the new loan and mortgage, defendant transferred her interests in both the Cavendish and Springfield properties to plaintiff, and the following month she quitclaimed her interest in the mobile home to him. Defendant claimed at trial that she was induced to make these transfers by plaintiff's fraudulent misrepresentation that she would lose her disability benefits if she retained title to the properties. The trial court found, however, that both parties believed that "it would be to their mutual financial advantage to transfer all of their real estate into the plaintiff's name," as both "believed that these arrangements were likely to protect the defendant from any risk of losing her federal benefits because of having too many assets or too much income," particularly from the rented Springfield property.

¶ 6. After the parties moved into the Cavendish property, defendant began to pay plaintiff between $600 and $700 in rent. The trial court found that, like the real estate transfers, the parties believed that the rental arrangement would benefit defendant financially by allowing her to claim a renter's rebate. Shortly after the move, plaintiff used a portion of the remaining proceeds from the loan to pay off the outstanding mortgage balance on the Springfield property, approximately $20,000. In February 2007, the parties executed wills that named each other as the residuary beneficiary of their respective estates.

¶ 7. The parties lived together in Cavendish until June 2010, when plaintiff decided to end their relationship. Following an angry confrontation, defendant obtained a relief-from-abuse order against plaintiff and was awarded sole possession of the Cavendish property. Plaintiff evicted the tenants and moved into the mobile home in Springfield.

¶ 8. Plaintiff then filed a complaint in superior court seeking to evict defendant from the Cavendish property. Defendant answered and counterclaimed, alleging that the Cavendish and Springfield properties were the subject of a partnership agreement between the parties, and requested a dissolution and accounting. Alleging that she had been induced to convey the Springfield properties by plaintiff's fraudulent misrepresentations, she also sought equitable relief through imposition of a resulting or constructive trust. She later claimed that the Cavendish property was also held in a constructive trust for her benefit.

¶ 9. Following a two-day evidentiary hearing in November 2010 and February 2011, the trial court issued a written ruling in favor of plaintiff. The court found no persuasive evidence that the parties had entered into a partnership concerning the properties. Nor did the court find any basis to support the imposition of a resulting trust. Nor, finally, did the court credit defendant's claim that plaintiff had fraudulently induced the transfers, or her contention that plaintiff owed the defendant a "special fiduciary duty." Accordingly, the court found no basis for imposition of a constructive trust. Consistent with these findings, the court issued a final judgment order granting plaintiff a writ of possession for the Cavendish property, requiring defendant to pay plaintiff rent of $560 per month until she left or was removed from the property, and denying defendant's counterclaims. This appeal followed.

¶ 10. On appeal, defendant contends that the trial court erroneously denied her request for equitable relief.[1] Our review is limited. "We review equitable remedies, like the creation of a constructive trust, for a trial court's abuse of discretion." *Weed v Weed*, 2008 VT 121, ¶ 16, 185 Vt. 83, 968 A.2d 310. This standard requires a showing that the court withheld its discretion entirely or exercised it on "clearly untenable" grounds. *Id.* (quotation omitted).

¶ 11. The circumstances under which a court may impose a constructive trust are broad and highly contextual. As we explained in *Weed*: "A court may impose a constructive trust when a party obtains some benefit that they cannot, in good conscience, retain. . . . Courts may employ constructive trusts to avoid unconscionable results and to prevent unjust enrichment." *Id.* ¶ 17. Unjust enrichment, in turn, rests on the principle that one should "not be allowed to enrich himself unjustly at the expense of another." *Id.* (quotation omitted). "[T]he inquiry is whether, in light of the totality of circumstances, it is against equity and good conscience to allow [a party] to retain what is sought to be recovered. . . . It must be a realistic determination based on a broad view of the human setting involved." *Id.* (quotation omitted).

¶ 12. While not always clearly articulated, defendant's argument here is that the trial court abused its discretion in declining to impose a constructive trust in several respects. She asserts that the properties were conveyed to plaintiff without the requisite "donative" intent, or actual present intent to convey title, and therefore should be held in a constructive trust for her benefit. See *Brousseau v Brousseau*, 2007 VT 77, ¶ 6, 182 Vt. 533, 927 A.2d 773 (mem.) (noting that the two essential elements of an inter vivos gift of property are "donative intent" and delivery). Although it is unclear whether this precise argument was expressly raised below, the trial court implicitly rejected it in finding no evidence — nor indeed any claim — of an agreement or

---

[1] Defendant has not renewed her claim that the properties were partnership assets, nor has she clearly and specifically challenged the court's findings that her financial contributions were insufficient to impose a purchase money resulting trust. She asserts in passing that the parties' mutual conveyances in 2001 lacked the requisite donative intent, but this claim was not clearly and specifically raised below, and therefore was not preserved for review on appeal. *Maguire v Gorruso*, 174 Vt. 1, 9, 800 A.2d 1085, 1092 (2002).

understanding between the parties that the property would ultimately be reconveyed to defendant.

¶ 13. Defendant principally contends that the trial court failed to properly credit her "significant contributions" to the acquisition and development of the properties. While acknowledging that defendant made some contributions over the years, the court — as noted — found no grounds for the imposition of a constructive trust absent a showing that plaintiff committed fraud or owed defendant a special fiduciary duty. The court's inquiry in this regard was — arguably — unduly narrow. The parties' purpose in effectuating a transfer, their respective contributions, and the existence of a confidential relationship could all theoretically be considered a part of the totality of the circumstances in determining whether in equity and good conscience the legal titleholder should be allowed to retain the property. See, e.g., *Lester v. Zimmer*, 542 N.Y.S.2d 855, 857 (App. Div. 1989) (holding that plaintiff's participation, support, and financial contributions to construction of vacation home during ten-year relationship with defendant were relevant considerations in action for imposition of constructive trust); *Rhue v. Rhue*, 658 S.E.2d 52, 58-59 (N.C. Ct. App. 2008) (upholding imposition of constructive trust on properties that parties bought and renovated together during long-term relationship). See generally, Restatement (Third) of Restitution & Unjust Enrichment § 28(1) (2011) (providing that party to relationship resembling marriage who contributes to asset may have claim for restitution to prevent unjust enrichment).

¶ 14. This is not an issue that we must address and resolve here, however, as it is well settled that "one who seeks relief in equity must come to the court with clean hands." *Savage v. Walker*, 2009 VT 8, ¶ 10, 185 Vt. 603, 969 A.2d 121 (mem.). See generally C. Yzenbrand et al., Bogert's Trusts and Trustees § 472, at 74 (2012) ("A plaintiff seeking the establishment of a constructive trust is subject to the ordinary rules of equity, including that he or she must come into court with clean hands . . . ."). As we explained in *Walker*, a party requesting a constructive trust on property "transfer[red] . . . to avoid his creditors . . . would not appear to meet this requirement." 2009 VT 8, ¶ 10. The same principle applies when the object of the conveyance is not to defraud a private creditor but to mislead the government. See, e.g., *In re Estate of Bruner*, 338 F.3d 1172, 1177 (10th Cir. 2003) ("Under the maxim, [h]e who comes into equity must come with

clean hands, a court . . . will not lend its aid . . . to one who has been a participant in a transaction the purpose of which was to defraud a third person, to defraud creditors, or to defraud the government." (quotation omitted)); *McMichael v. Flynn*, 686 So. 2d 254, 256 (Ala. Civ. App. 1995) (noting that "a party seeking to set aside a deed . . . is not entitled to have that deed set aside if the reason behind the transfer was to defraud a third party, such as a creditor or a governmental entity").

¶ 15. Courts have thus refused to impose a constructive trust in a variety of circumstances where the original transfer was to avoid a governmental penalty or obtain an unwarranted governmental benefit. See, e.g., *Bruner*, 338 F.3d at 1173 (holding that clean hands doctrine barred resulting or constructive trust on property which plaintiff induced his parents to purchase with his funds so that he could "avoid[] certain taxes and obtain[] other advantages"); *Hardy v. Hardy*, 910 N.E.2d 851, 853 (Ind. Ct. App. 2009) (invoking unclean hands doctrine to reject father's request to impose constructive trust on property that he transferred to his children to avoid possible excise tax, forfeiture, and fine). The facts in *McMichael* present a case in point. There, the defendant invoked the unclean hands doctrine in an action to set aside a deed, claiming that the plaintiff — her mother — had "conveyed the property to her in order to defraud a governmental entity into considering her to be eligible for Medicaid and other governmental benefits." 686 So. 2d at 256. The court acknowledged that the claim, if proven, would be sufficient to bar the action, but ultimately concluded that the evidence failed to support it. *Id.*

¶ 16. Here, in contrast, the court expressly found — and indeed defendant readily admitted — that the 2006 property transfers were intended to circumvent governmental regulations that jeopardized her continued eligibility to receive Social Security disability benefits. She would have the courts become complicit in that effort by requiring that the properties be held for her benefit, utilizing an equitable remedy designed to accomplish justice where enforcement of legal title would otherwise be intolerable to equity and good conscience. As the foregoing decisions make clear, however, a court will not lend its aid to any scheme designed to mislead or defraud the government. And the fact that both parties were involved in the effort does not alter this conclusion. See *Cook v. Cook*, 116 Vt. 374, 381, 76 A.2d 593, 598 (1950) ("Ordinarily where parties are in pari delicto a court of

equity will not afford relief . . . ." (quotation omitted)), *rev'd on other grounds*, 342 U.S. 126 (1951); see also *Bruner*, 338 F.3d at 1178 (holding that, under in pari delicto doctrine, "a party may not obtain equitable relief by proving inequitable conduct in which he participated"); *Eline Realty Co. v. Foeman*, 252 S.W.2d 15, 19 (Ky. Ct. App. 1952) (fact that defendant induced plaintiff to enter transaction to defraud government did not absolve plaintiff of unclean hands, as "[e]quity will not relieve one party against another where both are in pari delicto").

¶ 17. Although the trial court here did not rule on this issue, there is no factual dispute concerning the intended purpose of the property transfers. The undisputed evidence demonstrates that defendant lacked the "clean hands" necessary for an award of equitable relief. Accordingly, we affirm the judgment on that basis. See *Samplid Enters., Inc. v. First Vt. Bank*, 165 Vt. 22, 28, 676 A.2d 774, 778 (1996) (we may affirm judgment on rationale different from trial court where result was otherwise correct).

¶ 18. The dissent here argues that a fraudulent intent, or " 'guilty mind,' " is insufficient to support a finding of unclean hands absent an additional finding that defendant "actually benefitted from the arrangement." *Post*, ¶ 21. The dissent maintains that defendant's concern about her rental income and ownership of real property was unfounded because Social Security disability income is not means-tested. Thus, defendant's "potentially nefarious but ultimately ill-founded motives" provide, in the dissent's view, a weak basis for the denial of equitable relief. *Post*, ¶ 24.

¶ 19. The argument is unpersuasive for two reasons. First, on the record before us we need not accept the dissent's assertion that defendant made a mistake in acting on her belief that income from the Springfield property and her ownership interest in both the Springfield and Cavendish properties could affect her eligibility for government benefits or the amount of benefits. There were no findings on this issue either way, but as the dissent notes, there was evidence that defendant was a beneficiary of Medicaid, a needs-based program, and her disability may also entitle her to Social Security Insurance (SSI), also a needs-based program that is often confused with Social Security Disability Insurance (SSDI). The trial court did find that defendant "had a case manager to assist her with her benefits, and also had the assistance of an attorney in obtaining SSDI. She would have called on these people

for reliable information as to the steps necessary to retain eligibility for the programs she needed." The record and findings thus do not clearly support the mistake theory advanced by the dissent.

■ ■ ¶ 20. Even assuming, moreover, that defendant acted on a mistake, sound public policy — and ample authority — support the principle that a party forfeits any claim to equitable relief when a conveyance is rendered with the *intent* to defraud, even if the reason for the conveyance proves to be unfounded or mistaken. This general principle is expressed in the annotation cited by the dissent as follows: "[I]t has been held that the particular grantor's motive in conveying the property barred his recovery even though the purported claim was never asserted or was never established." D. Harrison, Annotation, *Rule Denying Recovery of Property to One Who Conveyed to Defraud Creditors as Applicable Where the Claim Which Motivated the Conveyance Was Never Established*, 6 A.L.R.4th 862, 867 (1981). As the court explained in *Bishop v. Bishop*, rejecting a claim that the grantor's fraudulent conveyance was mitigated by the fact that it was induced by misrepresentations, "it is the *moral intent* of a person in such a case as this, rather than any actual injury done, which determines whether he has come into court with clean hands." 257 F.2d 495, 501 (3d Cir. 1958) (emphasis added). Indeed, as the court in *MacRae v. MacRae* explained, "[t]o hold that equity only applies the [unclean hands] maxim . . . when the attempted fraud actually succeeds" would immunize the fraud "if it prove[d] in the end to have been unnecessary." 294 P. 280, 284 (Ariz. 1930). The court categorically rejected this approach, holding instead that the "requisite in determining . . . whether a party comes into court with clean hands is the moral intent, and not the actual injury done." *Id.* Numerous courts are in agreement. See, e.g., *Fakhri v. United States*, 507 F. Supp. 2d 1305, 1320 (Ct. Int'l Trade 2007) ("The moral intent, and not the actual injury incurred, is the fundamental inquiry in determining whether a party has unclean hands."); *Menard v. Menard*, 294 N.W. 106, 107 (Mich. 1940) (holding that unclean hands doctrine barred equitable relief where plaintiff's conveyance was intended to defraud creditor, even where plaintiff "later discovered there was no such actual liability"); *Hyde Park Amusement Co. v. Mogler*, 214 S.W.2d 541, 545 (Mo. 1948) ("[T]he fundamental requisite in determining whether a party comes into court with clean hands is the moral intent, and

not the actual injury done." (quotation omitted)); *Blaine v. Krysowaty*, 38 A.2d 859, 860-61 (N.J. Ch. 1944) ("The rights of fraud doers are not looked at in the light of the wrong they accomplish, but of the wrong they plan." (quotation omitted)). Accordingly, we are not persuaded that defendant is entitled to equitable relief because her admittedly improper purpose in effectuating the transfer was based on a mistake. Nor, as noted, does the fact that plaintiff and defendant both mistakenly believed the transfer would enhance defendant's eligibility for benefits alter this conclusion. *Cook*, 116 Vt. at 381, 76 A.2d at 598. Nor, finally, does the trial court's failure to specifically address this issue compel a remand where, as here, the evidence and findings concerning the intent of the transfers are clear and undisputed. See *Bishop*, 257 F.2d at 500 (holding that court may apply unclean hands doctrine, even where not set up as defense, where "the unconscionable character of a transaction" is plain).

*Affirmed.*

¶ 21. **Robinson, J.,** dissenting. These parties were involved in a long-term, committed, intimate partnership. Defendant brought into the relationship substantial equity in the Springfield property and mobile home, and the trial court expressly found that she made a significant contribution to the purchase of the second parcel in Cavendish. Now that the parties' relationship has ended with plaintiff holding legal title to both properties, the majority declines to address defendant's claims for equitable relief on the ground that she has "unclean hands." Because the majority relies solely on its own findings that defendant had a "guilty mind" when transferring her interests in the properties to plaintiff, without consideration of whether defendant actually benefitted from the arrangement, I respectfully dissent.

¶ 22. The doctrine of unclean hands "is not one of absolutes," and "does not apply to every unconscientious act or inequitable conduct on the part of a plaintiff." *Nelson v. Emmert*, 105 S.W.3d 563, 568 (Mo. Ct. App. 2003) (quotation omitted); see *Garbitelli v. Town of Brookfield*, 2011 VT 122, ¶ 15, 191 Vt. 76, 38 A.3d 1133 (finding that, in determining whether to deny aid to "unclean litigant," town board of abatement "was entitled to *weigh the equities* and take into account any bad conduct of taxpayer" (emphasis added)). When a court invokes a party's inequitable conduct to disqualify that party from pursuing equitable relief,

where such relief would otherwise be warranted, the court is necessarily prioritizing one equitable objective over another. Restatement (Third) of Restitution & Unjust Enrichment § 63 cmt. f (2011).

¶ 23. The trial court found that both parties believed that by quitclaiming her interests in the two properties, and paying rent in connection with the Cavendish property, defendant could protect her federal Social Security disability benefits from claims that she had too many assets or too much income. The trial court expressly declined to reach any conclusions regarding the accuracy of those beliefs. The majority's conclusion, which is based on the trial court's findings, thus relies solely on findings about defendant's subjective beliefs and intent, with no findings suggesting that defendant did, in fact, derive any advantage from the property transfers. Because the majority focused on the parties' shared subjective belief about the impact of defendant's property ownership on her disability benefits, rather than on whether that belief had any foundation in reality and whether she actually benefitted from the conveyances, I believe the majority wrongly concludes that, as a matter of law, the equitable balance in this case precludes defendant's claims.[2]

¶ 24. The distinction between defendant's subjective belief and the objective reality is real in this case. Social Security Disability Insurance (SSDI) is not a means-tested program. U.S. Soc. Sec. Admin., A Primer: Social Security Act Programs to Assist the Disabled, 66 Soc. Sec. Bull. 53, 54 (2005/2006), available at http://www.ssa.gov/policy/docs/ssb/v66n3/v66n3p53.html. For that reason, defendant's receipt of rental income and her ownership of real property had no effect on her entitlement to SSDI benefits, and by transferring her legal interests in the Springfield and

---

[2] This discussion accepts, for the sake of argument only, the majority's implicit conclusion that this Court can properly conduct such an equitable analysis in the first instance, without the benefit of the trial court's input on this highly discretionary subject. *Garbitelli*, 2011 VT 122, ¶ 15 (analyzing trial court's application of the unclean hands doctrine for abuse of discretion). I do not argue, as suggested in the majority opinion, that evidence of fraudulent intent or "guilty mind" is insufficient to support a finding of unclean hands. *Ante*, ¶ 18. Had the trial court made such a finding on this record, I may well affirm. The majority goes much further in this case and concludes *as a matter of law*, even without any findings by the trial court, that defendant had unclean hands and that the equitable balance in this case tips against allowing her equitable claim. It is this latter conclusion that I challenge.

Cavendish properties she did not derive any advantage with respect to SSDI benefits. This is not a case in which the defendant has, on the one hand, qualified for governmental benefits by disclaiming her interests in the properties at issue while, on the other hand, disavowing the disclaimers from which she benefitted. Defendant may have been trying to circumvent what she thought were SSDI eligibility requirements by conveying legal title to her property interests, but there is no evidence that the imagined requirements actually existed, or that she circumvented anything. Because there is nothing improper about her holding a beneficial interest in real property while receiving SSDI benefits, she was not improperly "having it both ways." Rather, the majority is denying defendant the possibility of equitable relief on account of her potentially nefarious but ultimately ill-founded motives.[3]

¶ 25. A Texas appeals court considered this same issue in a case in which the estate of a decedent sought to impose a constructive trust on property she had conveyed prior to her death. *Stout v. Clayton*, 674 S.W.2d 821 (Tex. Ct. App. 1984). The decedent had transferred the property because she believed that she needed to do so to protect her eligibility for Medicaid and Social Security disability benefits. The estate alleged that the decedent was in a confidential relationship with the grantees, and that the grantees had agreed at the time of transfer to hold the property only as long as the grantor needed government benefits. The court reaffirmed the general rule that "[w]here parties have transferred land in constructive fraud of creditors, it is the policy of the law to leave the parties in the position in which they placed themselves." *Id.* at 827. However, the court rejected the notion that, in

---

[3] The record includes evidence that defendant was a Medicaid beneficiary as well. Although eligibility for Medicaid, in contrast to SSDI, is based on an individual's income and resources, the trial court did not make any findings that defendant enjoyed Medicaid benefits to which she would not have been entitled if she had not conveyed her interests in the Springfield and Cavendish properties. If the trial court had made such a finding, then a ruling by that court along the lines articulated by the majority would not be an abuse of discretion. The only finding by the trial court that supports the majority's conclusion that defendant had unclean hands as a matter of law is that defendant and plaintiff transferred the properties to him to protect her SSDI. The majority's alternative hypotheses — that defendant was motivated by a desire to protect her Medicaid benefits, or that the trial court *really meant* "SSI" when it referred to SSDI — are not supported by the trial court's findings and, in the case of the latter, are not supported by the record.

the absence of any evidence of actual fraud, evidence that the grantor *believed* the transfer was necessary to protect her eligibility for government benefits was enough to preclude a constructive trust on account of the grantor's purported fraudulent intent. *Id.* at 827-28. The court found that there was not sufficient evidence in the record to determine whether ownership of the transferred property did jeopardize the grantor's eligibility for benefits. *Id.* Accordingly, the court concluded:

> Even if [the grantor] thought she was engaged in a fraudulent transaction, it was not proved she actually was. . . . The motive with which a conveyance is made and the fears by which it is prompted are of no importance unless there are creditors to be protected. The law has no concern with the futile intent to protect the property from a claim which its owner fears may be asserted . . . but which is never asserted and does not exist.

*Id.* at 828 (citation omitted).

¶ 26. Likewise, a New York court faced a similar situation when confronted with parties who had sought to convey legal title to their property out of fear that the government might assess the real estate for penalties on account of their violation of certain laws. *Buszozak v. Wolo*, 211 N.Y.S. 557 (Sup. Ct. 1925). The grantors' fear that their property was subject to assessment by the government, though suggested to them by a lawyer, had no basis in law. *Id.* at 566-67. The court concluded that the "unclean hands" doctrine did not preclude the grantors' equitable claim in that circumstance, explaining:

> The maxim is that "[one] who would come into a court of equity must come with clean hands." . . . The cases in which this maxim is usually applied arise where parties have put their property out of their hands to evade the just claims of creditors. Under such circumstances, with some exceptions, a court of equity will leave a grantor in the bed which [the grantor] has made. No rights of creditors are here involved. There is no pretense that these parties were indebted to any one.

*Id.* at 566.

¶ 27. For similar reasons, many courts have declined to invoke "unclean hands" to deny recovery of property conveyed to evade

creditors where the feared claim by creditors was never asserted or was not shown to actually exist. See, e.g., *Steele v. Lannon*, 355 So. 2d 190, 192 (Fla. Dist. Ct. App. 1978) (requiring more than bad motive or intention to defraud, but rather that there were "hindered creditors or indebtedness or other indicia of actual fraud"); *Pratt v. Watson*, 559 N.E.2d 280, 282 (Ill. App. Ct. 1990) ("The exception to this rule [that fraudulent transfers are binding] is that if no actual fraud has occurred and no creditors were threatened, damaged, or hindered, then the court can properly reconvey the property to the transferor." (citing *Rossow v. Peters*, 115 N.E. 524 (Ill. 1917))); *Valenti v. Valenti*, 108 N.Y.S.2d 315, 315-16 (App. Div. 1951) (reversing trial court's dismissal of claim seeking to impress trust upon real property because, although trial court concluded that property had been transferred with intent to defraud state of estate tax upon father's death, there was no evidence upon which it could be determined whether there was estate tax due on father's estate, and thus "no proof that there existed a debt or charge which could have been hindered or delayed, nor that there was a creditor who could be defrauded"); *Hickey v. Ross*, 172 P.2d 771, 774 (Okla. 1946) ("[W]here there are no actual creditors to defraud and the threatened litigation against the grantor is only imaginary and the transfer is without consideration, equity will give relief against the transfer."); *Bailey v. Banther*, 314 S.E.2d 176, 179-80 (W. Va. 1983) ("Equity makes courts reluctant to establish trusts in favor of those who transfer property to avoid creditors. . . . However, the equities are different when it turns out that the supposed claims were invalid, unproved, or illusory. . . . [A] conveyance to avoid potential creditors, who never press claims, will not justify application of the unclean hands rule . . . ."); see also *Gilpatrick v. Hatter*, 258 P.2d 1200, 1203 (Okla. 1953) ("[W]here there are no actual creditors to be defrauded and there is only a mental purpose to hinder an imaginary creditor, equity will not withhold relief."). But see *Menard v. Menard*, 294 N.W. 106, 107 (Mich. 1940). See generally D. Harrison, Annotation, *Rule Denying Recovery of Property to One Who Conveyed to Defraud Creditors as Applicable Where the Claim Which Motivated the Conveyance Was Never Established*, 6 A.L.R.4th 862 (1981).

¶ 28. Moreover, the trial court found that plaintiff and defendant *both* believed their arrangement would enhance defendant's eligibility for disability benefits. If defendant had actually benefitted

from the transactions in connection with her benefits, I would agree with the Court's application of the "clean hands" maxim, and with the in pari delicto corollary; on the facts of this case, plaintiff's knowing participation in the scheme is an additional factor weighing against barring defendant's claim for equitable relief against plaintiff. Insofar as the majority is concerned about defendant's guilty mind as opposed to any actual benefit she received as a result of the transactions, plaintiff's mind was just as (mistakenly) guilty. See *Nelson*, 105 S.W.3d at 568-69 (affirming trial court's decision against invoking unclean hands to bar equitable claim for return of property transferred to avoid claim of creditors where no actual harm came to potential creditors and grantee was complicit in scheme).

¶ 29. For the above reasons, the policy considerations supporting a denial of equitable relief for defendant are weak, and I cannot join the majority's holding that on these facts, as a matter of law, defendant is barred from pursuing equitable relief. Defendant's mind may have been impure, but we have no findings that defendant gained an improper advantage as a result of the conveyances, or that anyone was harmed.

¶ 30. By contrast, the equities potentially supporting defendant's claim are substantial. The trial court did not make any findings regarding defendant's equity in the Springfield property at the time she conveyed the property to herself and plaintiff as joint tenants with rights of survivorship, but found that several years later, in 2006, the property was worth at least $55,000 when defendant quitclaimed her remaining interest in the property to plaintiff. At that time, the outstanding mortgage balance on the property was $21,694.02. Accordingly, the equity in the Springfield property when defendant conveyed the balance of her interest to plaintiff was approximately $33,300. Even disregarding defendant's significant financial contribution to the purchase of the Cavendish property, acknowledged but unquantified in the trial court's findings, the magnitude of defendant's unjust enrichment claim against plaintiff is significant.[4] For that reason, I would reach the merits of defendant's equitable claims.

---

[4] The trial court also found that as a result of defendant's disavowal of any ownership interest in the Cavendish property, and her payment of rent, defendant was able to get a renter's rebate and plaintiff was able to deduct expenses associated with the Cavendish property on his taxes. This evidence might be sufficient to support an "unclean hands" bar against equitable relief for defendant

¶ 31. On the merits, the trial court's analysis was detailed and thoughtful. However, its analysis of defendant's unjust enrichment claim was too restrictive.[5] The court concluded that defendant's unjust enrichment theory failed because plaintiff had not fraudulently induced defendant to transfer her property interests to him, the parties had no explicit oral agreement that plaintiff held the interests in trust for defendant, and plaintiff had no special fiduciary duties to defendant.

¶ 32. The legal framework thus erected by the trial court was exceptionally narrow. First, the court seemed to limit its analysis to a contract-based framework — even though an unjust enrichment theory does not require any agreement. See *Savage v Walker*, 2009 VT 8, ¶ 8, 185 Vt. 603, 969 A.2d 121 (mem.) ("A constructive trust is not based upon the intention of the parties but is imposed in order to prevent one of them from being unjustly enriched at the expense of the other." (quotation omitted)); see also Restatement (Third) of Restitution & Unjust Enrichment § 1 cmt. d (2011) ("Restitution is the law of nonconsensual and nonbargained benefits in the same way that torts is the law of nonconsensual and nonlicensed harms. Both subjects deal with the consequences of transactions· in which the parties have not specified for themselves what the consequences of their interaction should be. . . . [T]he law of restitution identifies those circumstances in which a person is liable for benefits received, measuring liability by the extent of the benefit."). The trial court's reliance on the absence of an explicit oral agreement between the parties in evaluating the unjust enrichment claim was error.

¶ 33. Second, the trial court did not take into account modern developments in equity pursuant to which courts recognize that longstanding general principles of equity apply in distinct ways in the context of unmarried cohabitants in committed, long-term relationships. As reflected in the Restatement (Third) of Restitution and Unjust Enrichment, "If two persons have formerly lived together in a relationship resembling marriage, and if one of them

---

in connection with her acknowledged investment in the Cavendish property, but would not affect her equitable claim relating to the Springfield property.

[5] Defendant framed the unjust enrichment claim as a claim for a constructive trust. Constructive trust is the remedy defendant sought; the underlying equitable claim was primarily one of unjust enrichment. See *Weed v Weed*, 2008 VT 121, ¶ 16, 185 Vt. 83, 968 A.2d 310 (describing constructive trust as equitable remedy).

owns a specific asset to which the other has made substantial, uncompensated contributions in the form of property or services, the person making such contributions has a claim in restitution against the owner as necessary to prevent unjust enrichment upon the dissolution of the relationship." *Id.* § 28(1).[6]

¶ 34. Although the foundational principles of unjust enrichment analysis are not qualitatively different when the parties are former unmarried cohabitants, courts have "relaxed" some fundamental requirements for liability in equity in recognition of the unique circumstances of such cases. *Id.* § 28 cmt. b. As a consequence, transactions between unmarried cohabitants may give rise to consequences by way of unjust enrichment that would not attach to the same transactions between strangers or even people in other confidential relationships such as parent and child. *Id.* The Restatement posits that most of these cases can be explained with reference to a party's frustrated expectations when a party confers a benefit in the expectation that the relationship would be something other than it ultimately proved to be. *Id.* § 28 cmt. c. "This is why the unjust enrichment in these cases can be demonstrated only in retrospect." *Id.*

¶ 35. On the basis of such considerations, the Court of Appeals in New York reversed the lower courts' dismissals of a claim for constructive trust made by a 56-year-old widowed farmer who had showered his younger new female companion with gifts — including title to his farm. *Sharp v. Kosmalski*, 351 N.E.2d 721 (N.Y. 1976). After he transferred his farm to his companion, she ended the relationship and ordered him to vacate the farm. Although the court recognized that the woman had made no promises to the farmer concerning his ongoing access to the farm, the court rejected the assertion that the law could not imply an agreement or limitation from the circumstances surrounding the transfer. *Id.* at 723-24. The court remanded the case for consideration of whether the woman's conduct in ousting the farmer "was in violation of [their] relationship." *Id.* at 724. The court instructed that the conveyance should be interpreted "not literally or irrespective of its setting, but sensibly and broadly with all its human implications." *Id.* (quotation omitted); see *Walker*, 2009 VT 8, ¶ 8

---

[6] Although all unmarried cohabitants fall within this category — friends, siblings, or computer-selected roommates may cohabit — for simplicity in this dissent, I use the term "unmarried cohabitants" to describe couples in committed long-term intimate relationships.

(unjust enrichment evaluation "involves a realistic determination based on a broad view of the human setting involved, rather than a limited inquiry confined to an isolated transaction" (quotation omitted)).

¶ 36. Similarly, the Supreme Court of Colorado considered a case in which an architect, who had designed a home to be shared with his unmarried partner and had contributed almost $170,000 to the cost of constructing the house, sought partition of the home after the parties broke up and his partner, to whom he had conveyed his interest in the property, ordered him to leave. *Salzman v. Bachrach*, 996 P.2d 1263 (Colo. 2000). The court explained that unjust enrichment does not depend upon any contract or agreement between the parties and concluded that the architect could proceed on his unjust enrichment case; the court remanded for, among other things, calculation of the architect's total contributions, as well as the offsetting rental value of his occupancy during the years he lived in the house rent-free. *Id.* at 1265, 1269-70.

¶ 37. Likewise, the Wisconsin Court of Appeals affirmed a judgment for unjust enrichment in a case brought by a former girlfriend who had deeded a portion of her property to her cohabiting boyfriend so he could get a loan from the bank and build a garage for his tools on the land. *Wilson v. Ogilvie*, No. 98-2976, 1999 WL 326202 (Wis. Ct. App. May 25, 1999). Although the unpublished opinion has no precedential value, the court's reasoning that the evidence supported the trial court's finding that the transfer was not intended as a gift, and its assessment that she had conferred a benefit on him the retention of which would be inequitable under the circumstances, is instructive.[7]

¶ 38. In all of these cases, courts allowed equitable relief for individuals who had taken the affirmative step of deeding their own property interests to their unmarried cohabitants. Courts did so even though legal title to the property was thereby vested in the (former) cohabitants, and even though there was no evidence of an agreement or promise by the (former) cohabitant to hold the property in trust, to deed it back upon request, or to allow ongoing access to the initial owner who made the conveyance. The

---

[7] Significantly, the trial court did *not* make a finding in this case that defendant's 2006 transfers to plaintiff of her interests in the Springfield and Cavendish properties were intended as gifts.

question these courts asked was, in substance, the central question this Court asks in unjust enrichment cases: "whether (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Reed v. Zurn*, 2010 VT 14, ¶ 11, 187 Vt. 613, 992 A.2d 1061 (mem.) (quotation omitted).

¶ 39. Likewise, modern courts have allowed unjust enrichment claims based on an unmarried cohabitant's investment in improvements to property owned by the other. See, e.g., *Thibeault v. Brackett*, 2007 ME 154, 938 A.2d 27 (affirming unjust enrichment award for girlfriend who made substantial contributions for improvements to her boyfriend's home, in which she lived with him for six years); *Hendrick v. Tellier*, 710 N.Y.S.2d 750 (App. Div. 2000) (affirming that ex-boyfriend who had made substantial improvements to ex-girlfriend's home while they lived there together before she ended their engagement could pursue an unjust enrichment claim). And an unmarried cohabitant is not barred from pursuing an unjust enrichment claim for return of cash advanced to the other following a break-up. See, e.g., *Lawlis v. Thompson*, 405 N.W.2d 317, 319 (Wis. 1987) ("It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience [that person] ought not to retain it . . . .") (quotation omitted).

¶ 40. This strand of unjust enrichment cases does not displace the law governing gifts or contracts, and the fact remains that the only way to secure the full legal and economic protections incident to legal marriage — including a regime of equitable division upon divorce — is to legally marry.

¶ 41. Pursuant to the principles of equity, not every unmarried cohabitant who confers an economic benefit on his or her partner is entitled to payback if the relationship ends. In this case, defendant may or may not ultimately be entitled to restitution, whether in the form of a constructive trust or a money judgment, for her substantial investments in the Cavendish and Springfield properties, and any such judgment could well be subject to offsets for benefits received. But she is entitled to an assessment of the evidence supporting her unjust enrichment claim in light of the applicable principles of equity law; the absence of a fiduciary duty,

fraud, or an express agreement between the parties may be relevant, but is not determinative of her equitable claim. Accordingly, I would remand for the trial court to reevaluate the evidence in light of the above principles of equity or to take more evidence in its discretion.